## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES RAY DORSEY, | § | |
| (TDCJ-CID #859151) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-1342 |
| | § | |
| RICK THALER, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

The petitioner, Charles Ray Dorsey,[1] seeks habeas corpus relief under 28 U.S.C. § 2254. Dorsey challenges his 2001 state felony murder conviction. The respondent filed a motion for summary judgment, (Docket Entry No. 17), with a copy of the state-court record. Dorsey filed a response. (Docket Entry Nos. 21 & 22). Having carefully evaluated the pleadings, the motion and response, the record, and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons are set out below.

## I.    Background

The indictment charged Charles Ray Dorsey a/k/a Chad Dorsey with "intentionally and knowingly caus[ing] the death of an individual, namely, Pamela Gale Dorsey, by shooting her." (Clerk's Record, Vol. I, p. 13). A jury found Dorsey guilty as charged and sentenced him to life imprisonment. On November 19, 1998, the trial court imposed sentence in accordance with the jury's verdict. (*Id*. at 3). On September 6, 2002, the Ninth Court of Appeals reversed and remanded

---

[1]    Because three members of the same family are involved, the court will use the following designation: Charles Ray Dorsey is "Dorsey"; Pamela Gale Dorsey is "Pamela Dorsey"; and C.D. is the couple's two and a half year-old child.

for a new trial.  (*Id.* at 29-49); *Dorsey v. State*, 24 S.W.3d 921 (Tex. App. - Beaumont 2000, no pet.).

The mandate issued on November 20, 2000.  (Clerk's Record, Vol. I, p. 14).

On February 2, 2001, Dorsey filed a motion to suppress the evidence seized in the search incident to his arrest and in later searches under warrants, as well as his statements.  (*Id.* at 154-172).

A hearing on the motion was held on March 8, 2001.  (Reporter's Record, Motion to Suppress, pp. 1-267).  The trial court granted the motion to suppress in part and denied it in part, suppressing the audio portion of a videotape showing Dorsey's two and one-half year-old son, C.D., with a gun that he could not fire.  The videotape was inconsistent with the defense that the child accidentally fired the gun, killing Pamela Dorsey.  The judge admitted the visual portion of the videotape, all the items seized in the initial warrantless search pursuant to the arrest and the later searches, and Dorsey's statements.  (Clerk's Record, Vol. II, p. 216).

On June 4, 2001, the case was tried a second time.  On June 14, after the jury told the court they were "hopelessly divided" on the verdict and would "not be able to come to a unanimous descision[sic]," the trial court granted Dorsey's motion for a mistrial.  (Clerk's Record, Vol. II, p. 273).  On August 8, 2001, Dorsey moved to recuse the trial judge.  The motion was denied after a hearing on September 17, 2001.  (Clerk's Record, Vol. II, pp. 298-307).

On November 5, 2001, the case was tried a third time.  The jury found Dorsey guilty and sentenced him to a 40-year prison term.  (Clerk's Record, Vol. II, p. 353, 362).  On November 15, 2001, the trial court imposed the sentence and made an affirmative finding on the use of a deadly weapon.  (Clerk's Record, Vol. II, pp. 364-366).  On August 28, 2003, the Ninth Court of Appeals of Texas modified the judgment to remove the deadly weapon finding and affirmed the conviction.

*Dorsey v. State,* No. 09-02-023-CR, 117 S.W.3d 332 (Tex. App. -- Beaumont [9th Dist.] 2003, pet. ref'd).

On April 24, 2007, Dorsey filed his first application for a writ of habeas corpus under Article 11.07 of the Code of Criminal Procedure. He asserted as grounds for relief the denial of his right to effective assistance of appellate counsel, in violation of the Fifth and Sixth Amendments. *Ex parte Dorsey,* Application No. 67,702-01 at 8. On September 12, 2007, the Court of Criminal Appeals of Texas granted Dorsey's first application for writ of habeas corpus in an unpublished opinion, allowing for an out-of-time petition for discretionary review. *Ex Parte Dorsey,* 2007 WL 2650664 (Tex. Crim. App. September 12, 2007). The Texas Court of Criminal Appeals refused Dorsey's petition for discretionary review on February 6, 2008. On June 23, 2008, the United States Supreme Court denied Dorsey's petition for a writ of *certiorari*.

Dorsey filed a second application for state habeas corpus relief on June 18, 2009. The Texas Court of Criminal Appeals denied the application without written order, on the findings of the trial court, without a hearing, on April 7, 2010. *Ex parte Dorsey,* Application No. 67,702-02 at cover.

On April 8, 2010, this court received Dorsey's federal petition. He contends that his conviction is void for the following reasons:[2]

(1)    there was no evidence to support his conviction for murder. (Dorsey's claim D1).

(2)    his trial counsel was ineffective for:

    A.    failing to object to:

---

[2]    Dorsey presented 32 claims in his federal petition and supporting memorandum. In responding to the petition, the respondent reorganized Dorsey's claims. The court adopts the respondent's organization of the claims and, for clarity, indicates the corresponding number Dorsey used to identify his claim by a number preceded by the letter "D."

 (1) the video interrogation of C.D., on confrontation grounds (Dorsey's claim D2);

 (2) Detective Tidwell's narration of C.D.'s video interview, on hearsay and confrontation grounds (Dorsey's claim D5);

 (3) the .22 caliber revolver and holster, on the ground of relevance (Dorsey's claim D19);

 (4) the State's closing argument about Dorsey invoking his *Miranda* right to counsel (Dorsey's claim D21);

 (5) leading questions by the State (Dorsey's claim D23);

 (6) the State's improper closing argument misstating evidence outside the record (Dorsey's claim D27);

 (7) the State's misstatement of evidence during closing arguments that Dorsey's GSR test was substantially higher than the Complainant's (Dorsey's claim D28);

 (8) the admission of hearsay evidence that had previously been ruled inadmissible by the Texas Ninth Court of Appeals, on the grounds that it violated collateral estoppel under double jeopardy (Dorsey's claim D31); and

 (9) the admission of hearsay evidence that had previously been ruled inadmissible by the Texas Ninth Court of Appeals on the grounds that it violated the law of the case doctrine (Dorsey's claim D32);

B. failing to request a hearing (Dorsey's claims D6 and D17);

C. failing to question witnesses (Dorsey's claims D7 and D18);

    D.      failing to request a mistrial (Dorsey's claim D19);

    E.      failing to request a limiting instruction (Dorsey's claim D20);

    F.      failing to strike jurors for cause (Dorsey's claim D24);

    G.      failing to obtain a defense expert (Dorsey's claim D22); and

    H.      failing to rebut testimony elicited by the State (Dorsey's claims D25 and D26).

(3)    His appellate counsel was ineffective for failing to raise on direct appeal:

    A.      that the trial court abused its discretion in admitting the video interrogation of C.D., on the ground that it violated Dorsey's right to confrontation and cross-examination (Dorsey's claims D3 and D29); and

    B.      that the trial counsel was ineffective for failing to timely object to Detective Tidwell's narration of C.D.'s video, on the ground that it was hearsay (Dorsey's claims D4 and D30).

(4)    The prosecutor committed misconduct by failing to maintain a consistent position on whether the videotaped interview of C.D. was an interview/interrogation or an experiment/re-enactment (Dorsey's claims D8 and D9).

(5)    The trial court erred by:

    A.      admitting the videotape showing C.D. and a gun into evidence because:

        (1)    it failed to meet the requirements of an admissible police experiment (Dorsey's claim D10);

        (2)    it was admitted over the objection of the defense if it was an interview (Dorsey's claim D11);

        (3)    it did not comply with any family codes (Dorsey's claim D15); and

      (4)       the video was made in violation of a court order (Dorsey's claim D16);

    B.      allowing out-of-court statements into evidence (Dorsey's claim D13); and

    C.      admitting hearsay statements (Dorsey's claim D14).

(6)      His right to confront witnesses was violated.

(7)      His conviction violated double jeopardy.

(Docket Entry No. 1, Federal Petition, pp. 7-39; Docket Entry No. 2, Petitioner's Memorandum, pp. 11-145).

Each ground is analyzed below.

## II.    The Applicable Legal Standards

Dorsey's petition is reviewed under the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996.  28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).  Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits."  An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural."  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

AEDPA provides in pertinent part as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1)   In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.  In deciding whether a state court's application was unreasonable, a federal habeas court considers whether the application was "objectively unreasonable." *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000).  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was

7

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Pure questions of fact are governed by § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Dorsey proceeds *pro se*. In this circuit, *pro se* habeas petitions are construed liberally and are not held to the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir.

1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981).  This court broadly interprets Dorsey's state and federal habeas petitions.  *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## III.    The Trial Record

At trial, Catherine Villabolos, a Montgomery County Sheriff's Department Dispatcher, testified that at about 2:00 a.m. on May 14, 1996, Dorsey called 911 and reported, "My wife's been shot."  (Reporter's Record, Vol. III, p. 83; Vol. IV, p. 67).  When the 911 operator asked if he was in danger, Dorsey responded, "No. No, I'm not. It's my little boy.  He got in her purse and got her gun."  (Reporter's Record, Vol. IV, p. 67).  Dorsey told the operator that his son, C.D., was "2 ½ years old."  (*Id*., p. 68).  Dorsey did not know if his wife was still breathing. When the dispatcher asked him to check on her, Dorsey said he could not because he was trying to keep his little boy away from his wife.  (*Id*.).  When the dispatcher asked Dorsey where his wife was shot, Dorsey responded that he did not know.  (*Id*., p. 70).  When the dispatcher told Dorsey that it was "real important that you help me out so we can help her," Dorsey responded, "I think it's her head, I don't know."  (*Id*.).  When asked to check her pulse, Dorsey stated, "I can't tell with my fingers.  My fingers have been cut off a few years ago and I have no feeling in the ends of them."  (*Id*., p. 72). Dorsey repeatedly told the dispatcher, "I can't," when he was asked to go look at his wife.  (*Id*., pp. 70-71).  Dorsey hung up on the dispatcher twice. Dorsey told the 911 operator and the Sheriff's dispatcher that he was "trying to get my parents." (*Id*., p. 74).

An emergency crew was sent to the Dorsey home.  Montgomery County Sheriff's Deputy Bruce Zenor talked to Dorsey.  (Reporter's Record, Vol. IV, pp. 43-44).  Deputy Zenor testified that when he arrived, Dorsey was wearing a multicolored striped short-sleeved shirt and a pair of blue jeans.  Although the dispatcher noted that she had heard what sounded like vomiting, Deputy Zenor did not see or smell evidence that anyone had recently vomited.  (*Id*., p. 33).  Dorsey was hysterical

9

and sobbing.  Dorsey told Deputy Zenor that he, his wife, and their son, C.D., were in the bedroom earlier that night.  (*Id*., p. 44).  Dorsey told Zenor that "[h]e had gotten up to do some paperwork and went to the living room.  Around 2:00 a.m. he recalled hearing a gunshot, what he had thought was a gunshot.  He went to the bedroom and discovered that [C.D.] had gotten a pistol out of Ms. Dorsey's purse."  (*Id*., p. 45).  Dorsey did not say that he saw C.D. with the gun.  (*Id*., pp. 45-46).

In his videotaped interview the same morning, Dorsey denied any marital problems. (Reporter's Record, Vol. IV, p. 139).  Detective Moore testified that Dorsey never mentioned a pending divorce.  (*Id*., p. 190).  Nor did he mention that he had called his parents during his call to 911.  (*Id*., p. 191).

Linda Reynolds, Pamela Dorsey's supervisor, testified that the Sunday night before her death, Pamela Dorsey had asked Dorsey for a divorce.  (Reporter's Record, Vol. III, pp. 32, 34, 39, 40).  Sherri Scarpa, who worked for Pamela Dorsey, testified that she was very upset about her marriage and was fearful of Dorsey.  Scarpa testified that Dorsey had told Pamela Dorsey that "he would take the baby to Scotland, should she leave."  (*Id*., pp. 47, 48, 49, 50, 51).  Rachel Courrege, Pamela Dorsey's coworker, testified that at lunch the day before her death, Pamela Dorsey said that "she was going to go home and let her husband know that she was serious this time.  She wanted a divorce and things were over."  (*Id*., pp. 38, 41, 42; Reporter's Record, Vol. VI, pp. 33, 34, 36). Stacey Hert, a friend of Pamela Dorsey's, testified that she knew about the Dorseys' marital relationship and "[i]t was not a good one."  (*Id.*, pp. 140, 154, 156).

Pamela Dorsey was found on the bed in the master bedroom, laying face down with her arms underneath her body and her right cheek on a soft pillow.  (Reporter's Record, Vol. III, pp. 56, 57, 67).  Her face was not visible.  She was covered to her neck with a blanket and sheet.  (*Id*., p. 57). Delane Potter, the security guard for Dorsey's subdivision who was first on the scene, moved

Pamela Dorsey's hair out of her face and noticed that she was "turning color, purplish at the lips area."  Potter also saw "two drops of blood coming out of her nose onto her lip."  (*Id*., pp. 52, 53, 55, 57-58).  Potter saw a gun "on the floor by the bed, and the little covering alongside the lower part of the bed fell right on the weapon."  (*Id*., p. 59).

James Reid, the in-charge paramedic, arrived on the scene at 2:20 a.m.  (Reporter's Record, Vol. III, pp. 82, 84, 86).  Reid's initial check for vital signs revealed that Pamela Dorsey had agonal respiration and a weak carotid pulse.  (*Id*., p. 86).  Reid surveyed the body, but he did not find any major injury.  (*Id*., p. 88).  He noted that a small amount of blood had dripped from the nostril onto the pillow.  Reid and his partner began life-saving techniques.  Because "copious amounts of blood and tissue" filled the throat, intubation  could not be completed.  (Reporter's Record, Vol. IV, pp. 15-16).  Defibrillation was used three times in the ambulance.  (*Id.*, pp. 10-11).  A tracheostomy was performed at the hospital.  (Reporter's Record, Vol. III, p. 125; Reporter's Record, Vol. IV, p. 91).  Pamela Dorsey could not be saved.  (Reporter's Record, Vol. IV, p. 121).

The autopsy showed that Pamela Dorsey died from a gunshot wound to the back of her head. (Reporter's Record, Vol. IV, pp. 93, 105; Reporter's Record, Vol. X, Ex. 80).  Dr. Vladimer Parangao testified about the autopsy from the report prepared by Dr. Nancy Krohn, who had resigned from the Harris County Medical Examiner's Office.  (Reporter's Record, Vol. IV, pp. 85, 88, 89).  When he testified, Dr. Parangao was an assistant medical examiner in the Travis County Medical Examiner's Office.  He had retired from the Harris County Medical Examiner's Office, where he had served over 19 years as an assistant medical examiner.  (*Id*., p. 86).

Dr. Parangao testified that his external examination of the body revealed a minute abrasion – a small scraping of the skin – on the lateral aspect of the right eye.  He found discoloration of the left temple consistent with head trauma.  The bullet had entered the back of the head, moving from

back to front, left to right, and upward.  (Reporter's Record, Vol. IV, p. 95).  In Dr. Parangao's opinion, the petechia in both lower palpebral conjunctivae (the pinhead-sized hemorrhages in the eyes under the lower lids), the bruises on the strap muscle of her neck, and a linear bruise towards the left side of the neck, were all unrelated to resuscitation efforts.  (*Id.*, pp. 91, 92-93, 98, 101-02).  Dr. Parangao testified that the presence of petechial hemorrhage in the eye showed that the cause of death was asphyxiation.  (*Id.*, p. 99).  Dr. Parangoa testified that the bruises on the strap muscle of the neck were too high to be associated with CPR or a tracheostomy.  The combination of these injuries could reasonably be explained by a person putting his forearm on the neck and pressing the arm on the neck.  Dr. Parangao stated that gunshot wounds cases seldom cause petechial hemorrhaging.  (*Id.*, pp.  103-104).  Dr. Parangao also testified that Pamela Dorsey had a hemorrhage on the left side of her head in the temple area, suggesting that she was hit in that area. (*Id.*, p. 107).    Peggy Frankhouser, a crime-scene investigator for the Montgomery County Sheriff's Department, testified.  (Reporter's Record, Vol. IV, pp. 214-15).  On May 14, 1996, she completed gunshot residue kits for Charles Dorsey and C.D.  She also took photographs of the residence.  (*Id.* at 221).  Frankhouser identified State's Exhibits 46 and 47 as the gun and holster that she collected at the scene that night.  She made a scale diagram of the crime scene.  She collected all the bed clothing and measured the length and width of the bed in relation to other items in the bedroom.  She performed a fingerprint analysis on the weapon and determined that the prints that were developed were not suitable for identification.  (*Id.* at 225).   While Frankhouser was at the residence, she saw Dorsey and C.D. together.  After completing the gunshot residue kit on C.D., Frankhouser gave C.D. one of the gloves to play with.  Dorsey took the glove, blew it up like a balloon, tied it up, and gave it to C.D.  (*Id.* at 235).  At the hospital, Frankhouser removed the jewelry from Pamela Dorsey's body and noted that she was wearing a bra, a pair of panties, and white, insulated underwear.  (*Id.*

at 236).  She also completed the gunshot residue kit on Pamela Dorsey.  Lieutenant Frankhouser testified that the bed assembled in the courtroom was similar to that found at the crime scene on May 14, 1996.  She further testified that the bed clothing fit the bed the same way as it did at the crime scene.  (*Id*., p. 72).

David Tanner, a firearms examiner for the Montgomery County Sheriff's Department Crime Lab, testified that State's Exhibit 46 was a Taurus Model 94 9-shot revolver.  Tanner checked the trigger pull of the weapon, whether the weapon functioned properly, and whether a bullet fragment recovered from Pamela Dorsey could be traced to the weapon.  (Reporter's Record, Vol. V, p. 137). He testified about the difference between a single-action trigger pull and a double-action trigger pull. The amount of pressure needed to fire a weapon with a single-action trigger was four pounds; eleven pounds was required for double action.  (*Id.*, p. 140).

Ivan Wilson, a criminalist in the Trace Evidence Section of the Texas Department of Public Safety Crime Laboratory in Austin, testified about his analysis of the gunshot residue (GSR). Wilson explained that three elements – antimony, barium and lead – must be present to conclude that gunshot primer residue is present.  (Reporter's Record, Vol. V, p. 155).  Wilson explained that when a test is negative, that means that all three of the elements were not present in the minimum amount. Possible reasons include that the person had not fired a weapon or been close to a weapon that had been fired; there was no antimony present in the ammunition; or, if the residue was there originally, it had been removed by the person's activity.  The hand swabs from C.D. showed lead and barium, but there was insufficient antimony to make a positive finding for gunshot residue.  Dorsey and Pamela Dorsey also tested negative for gunshot residue.  (*Id*., p. 158).  Wilson explained that a GSR test shows whether someone was in the presence of gunshot primer residues.  A positive value does not show that that person fired a weapon.  Anyone in the close vicinity of a shot could have the

residue deposited on their hands.  If a person picked up a weapon that had been fired, or any other object with the residue, the gunshot residue could be transferred to their hands.  (*Id.*, p. 161).  Any touching of the hands can transfer the gunshot residue from one area to another.

Bonnie Tidwell, a detective with the Montgomery County Sheriff's Office who worked on child-abuse cases, interviewed C.D. on May 28, 1996.  She observed that C.D. was a happy, healthy, exuberant child and did not notice any medical problems or motor deficiencies.  She had learned that the child had been involved with a weapon and a death, and needed to determine whether he was capable of firing the weapon.  She placed State's Exhibit 46, a Taurus .22 caliber revolver inside a holster that snaps, in the interview room. (Reporter's Record, Vol. V, p. 10).  Tidwell identified State's Exhibit 76 as the tape of her interview with C.D.  In the interview, C.D. first picked up dolls, then dropped them and went over to the gun.  (*Id.* at 21).  Tidwell testified that C.D. was unable to unfasten the strap on the holster and to fire the gun, or to pull the hammer back or cock the weapon.  He could not operate the weapon when it was in double-action mode.  When Detective Tidwell cocked the weapon, C.D. was able to pull the trigger.  (*Id.* at 26-27).

During his case, Dorsey showed that C.D. was familiar with guns and would play with them.  Dorsey's family friends testified that they saw C.D. run into the living room with his fingers pointed like a gun.  (Reporter's Record, Vol. VI, pp. 105, 107-08, 114, 115, 116-17).  C.D. would run to his mother, pointed at her, and say "pow pow,"  and his mother would fall over and play dead. (*Id.,* pp. 108, 117).

Dorsey's mother testified that during the spring of 1996, before her daughter-in-law's death, she was babysitting C.D., (Reporter's Record, Vol. VII, pp. 5, 8, 12).  When she came out of the bathroom, C.D. had taken her gun from the nightstand next to her bed and was pointing it at her.

14

(*Id.*, pp. 14-15).  Dorsey's mother testified that she had placed her gun in the nightstand next to her bed the night before, and that C.D. did not see her put it there.  (*Id.*, pp. 15, 17).

Steve Roberts, Dorsey's high-school friend, testified that he went to visit Dorsey in late 1995 or early 1996.  (Reporter's Record, Vol. VI, pp. 122, 124, 125).  Dorsey was not home, so Roberts talked to Pamela Dorsey and C.D.  (*Id.*, p. 126).  During the visit, C.D. was on the floor fumbling with something.  Roberts saw that it was a handgun.  (*Id.*, pp. 127, 128).  When Roberts told Pamela Dorsey that C.D. had a gun, she said, "Oh," and took the gun to another room.  (*Id.*, p. 129).

Stacey Hert testified that she when she visited Pamela Dorsey at the condo at the end of 1995 or the beginning of 1996, C.D. climbed onto the kitchen counter and started going through Pamela Dorsey's purse.  (Reporter's Record, Vol. VI, pp. 142, 143).  C.D. pulled out a small, silver-colored gun with both hands, as if he was going to shoot.  (*Id.*, pp. 146, 147-48).  On cross-examination, Hert admitted that C.D. did not have his hand on the trigger.  Hert did not know if C.D.'s fingers could reach the trigger.  (*Id.*, p. 150).

Dorsey played a videotape he had made of C.D. pushing a lawnmower.  (Reporter's Record, Vol. VII, pp. 41-42, 43).  The video was shown to the jury without sound.  (Reporter's Record, Vol. VI, p. 38).

On rebuttal, the State called Peggy Sue McRae.  She testified that in May 1996, she worked as a clerk at a video rental store near where the Dorseys lived.  (Reporter's Record, vol. VII, p. 242).  McRae testified that State's Exhibit 75 contained an invoice showing the rentals to Pamela and Charles Dorsey from March to May 6, 1996.  One week after she read about Pamela Dorsey's death in the paper, McRae went to the computer and looked up the Dorsey's account.  She saw that the movie "Never Talk to Strangers" was rented on May 5 and returned May 6, 1996.  (Reporter's Record, Vol. VIII, p. 3).  McRae told her supervisor that the rental of this movie by Charles Dorsey

15

might be pertinent.  Detective Tidwell testified that she watched the movie.  (*Id.*, p. 21).  The plot features a female psychiatrist who becomes involved with an undercover police officer and has flashbacks of childhood events.  One flashback was of being with her father when she was five years old.  In the flashback, the father places the child in front of him, puts the child's hands on a gun, puts his hand over the child's hands, pulls the trigger, and kills the mother.  The psychiatrist ultimately killed her father and the police officer.  (*Id.*, p. 24).

Amy Bethane testified that she lived next door to the Dorsey family for three years. (Reporter's Record, Vol. VIII, p. 51).  She had a daughter who was six months older than C.D.  She never saw C.D. use his finger and point it at someone and say, "pow pow."  She had a conversation with Pamela Dorsey one or two weeks before the murder, in which Pamela Dorsey said she was tired of the abuse and was going to leave Dorsey.  (*Id.*, p. 54).

Jeanette McClure, Pamela Dorsey's mother, testified that her daughter did not sleep with her bra on.  On the night her daughter was shot and killed, Dorsey never called to tell her of the shooting or that her daughter had died.  (*Id.* at 56).

## IV.   The Issues of Exhaustion and Procedural Default (Grounds 1, 2A8, 2A9, 5B, and 5C)

Ordinarily, a state prisoner seeking federal habeas relief must first "exhaus[t] the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A).  *Coleman v. Thompson,* 501 U.S. 722, 731 (1991).  Exhaustion requires that the prisoner "have fairly presented the substance of his claim to the state courts."  *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997).  A state prisoner must give the state court a full opportunity to resolve constitutional issues by invoking one complete round of the State's established appellate review process.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999).  "Determining whether a petitioner exhausted his claim in state court is a case-and-fact-specific inquiry."  *Moore v. Quarterman,* 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

16

A federal court generally cannot review the merits of a state prisoner's habeas petition if the claims in the petition are procedurally defaulted.  *See, e.g., Magwood v. Patterson,* —— U.S. ——, 130 S. Ct. 2788, 2801 (2010) ("If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention—whether in trial, appellate, or habeas proceedings, as state law may require—procedural default will bar federal review.").  A habeas claim can be procedurally defaulted in two ways.  *Coleman v. Dretke,* 395 F.3d 216, 220 (5th Cir. 2004), *cert. denied,* 546 U.S. 938 (2005).  First, if the prisoner has presented the claim to the highest available state court but that court has dismissed the claim on a state-law procedural ground instead of deciding it on the merits, the claim has been decided on an independent and adequate state-law ground.  *See, e.g., Harris v. Reed,* 489 U.S. 255, 262 (1989).  "If a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for dismissal, the prisoner has procedurally defaulted his federal habeas claim."  *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997), *cert. denied,* 523 U.S. 1139 (1998).  The state procedural rule must be "both independent of the merits of the federal claim and an adequate basis for the court's decision."  *Finley v. Johnson,* 243 F.3d 215, 218 (5th Cir. 2001).  A state procedural rule is an adequate basis for the court's decision only if it is "strictly or regularly applied evenhandedly to the vast majority of similar claims."  *Amos v. Scott,* 61 F.3d 333, 339 (5th Cir.) (emphasis omitted), *cert. denied,* 516 U.S. 1005 (1995).

Second, "[p]rocedural default . . . occurs when a prisoner fails to exhaust available state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  *Williams v. Thaler,* 602 F.3d 291, 305 (5th Cir. 2010).

17

Dorsey complains that the state trial court erred by admitting out-of-court statements despite an appellate court ruling excluding them [Ground 5B] and by admitting hearsay statements on the erroneous basis of optional completeness [Ground 5C].  (Docket Entry No. 1, Federal Petition, pp. 18-19; Docket Entry No. 2, Petitioner's Memorandum, pp. 128-32, 133-36).  The respondent argues that these claims are barred under the first type of procedural default.  (Docket Entry No. 16, Respondent's Motion for Summary Judgment, pp. 13-14).

Dorsey presented these claims in his state habeas application.  *Ex parte Dorsey,* Application No. 67,702-02 at 164-72.  The state habeas court found as follows:

> 7.  Applicant's grounds for relief 13 and 14 are record-based claims which are not cognizable on application for writ of habeas corpus. *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) (op. on reh'g).

*Ex parte Dorsey,* Application No. 67,702-02 at 479.  The Texas Court of Criminal Appeals denied the habeas application without written order, on the findings of the trial court, without a hearing. (*Id.* at cover).  Because the state habeas claims were defaulted based on adequate and independent state grounds, these claims are procedurally barred in this federal court.  *See, e.g., Aguilar v. Dretke,* 428 F.3d 526, 535 (5th Cir. 2005) (noting that *Gardner* is an adequate state basis for procedural default).

The respondent also argues that Dorsey failed to present the following three claims to the Texas Court of Criminal Appeals: the claim that there was no evidence to support his conviction, [Ground 1]; the claim that counsel rendered ineffective assistance by failing to object to the admission of hearsay evidence that had previously been ruled inadmissible by the Texas Ninth Court of Appeals on the grounds that it violated collateral estoppel under double jeopardy, [Ground 2A8]; and the claim that counsel rendered ineffective assistance by failing to object to the admission of

hearsay evidence that had previously been ruled inadmissible by the Texas Ninth Court of Appeals on the grounds that it violated the law of the case doctrine, [Ground 2A9].  (Docket Entry No. 17, Respondent's Motion for Summary Judgment, p. 8).   Dorsey moves to dismiss these claims, (Docket Entry No. 20).  The motion is granted.

Alternatively, the court notes that Dorsey did not challenge the sufficiency of the evidence claim — federal ground 1 — in a petition for discretionary review to the Texas Court of Criminal Appeals.  As to the other two claims at issue, federal grounds 1, 2A8 and 2A9, Dorsey raised them in an amended state habeas application, but the state habeas court had already forwarded Dorsey's state application to the Texas Court of Criminal Appeals.  This court cannot conclude that Dorsey's state habeas application fairly raised federal grounds 1, 2A8, and 2A9.  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. 4, 6 (1982) (internal citations omitted). "Rather, the petitioner must afford the state court a 'fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Bagwell v. Dretke,* 372 F.3d 748, 755 (5th Cir. 2004) (quoting *Anderson,* 459 U.S. at 6).  Dorsey's state habeas application did not afford such an opportunity to the state court.

Under Texas law, the failure to present claims 1, 2A8, and 2A9 to the Texas Court of Criminal Appeals precludes federal habeas relief based on those claims.  The record does not show that any state statutory exception applies.  Texas courts may not consider the merits of any subsequent application for postconviction relief challenging the same conviction unless the application meets one of three statutory exceptions.  The statutory exceptions are:

> (1)  the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal

19

basis for the claim was unavailable on the date the applicant filed the previous application;

(2)  by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3)  by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under [the Texas capital sentencing scheme].

TEX. CODE. CRIM. PRO. art. 11.071 § 5(a).  Dorsey offers no arguments that these claims fall within the exceptions.  Dorsey must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Wainwright v. Sykes,* 433 U.S. 72, 87-91 (1977); *Ries v. Quarterman,* 522 F.3d 517, 523-24 (5th Cir. 2008).  Dorsey offers no basis to find cause and prejudice that would excuse the procedural default. Dorsey's motion to dismiss grounds 1, 2A8, and 2A9 is granted.  Alternatively, Dorsey's grounds 1, 2A8, 2A9, 5B, and 5C are dismissed because they are procedurally barred.

## V.    The Claim of Ineffective Assistance of Trial Counsel  (Ground 2)

To establish an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that he was actually prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 68 (1984).  Whether counsel's performance was deficient is determined by an objective standard of reasonableness.  *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999). "[S]crutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  "[S]trategic

choices made after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable." *Id*. at 690-91; *see also United States v. Jones*, 287 F.3d 325, 331 (5th Cir.)

("Informed strategic decisions of counsel are given a heavy measure of deference and should not be

second guessed."), *cert. denied*, 537 U.S. 1018 (2002); *Lockett v. Anderson*, 230 F.3d 695, 714 (5th

Cir. 2000) (*Strickland* requires deference to counsel's "informed strategic choices").  "So long as

counsel made an adequate investigation, any strategic decisions made as a result of that investigation

fall within the wide range of objectively reasonable professional assistance." *Smith v. Cockrell*, 311

F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

     "A conscious and informed decision on trial tactics and strategy cannot be the basis for

constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire

trial with obvious unfairness." *Jones*, 287 F.3d at 331.  To overcome the deference given to

informed strategic decisions, a petitioner must show that his counsel "blundered through trial,

attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable

alternative course, or surrendered his client." *Id*.; *see also Moore v. Johnson*, 194 F.3d 586, 615 (5th

Cir. 1999) ("*Strickland* does not require deference to those decisions of counsel that, viewed in light

of the facts known at the time of the purported decision, do not serve any conceivable strategic

purpose.").

     Even if a petitioner establishes that his counsel's performance was deficient, he must also

establish that "prejudice caused by the deficiency is such that there is a reasonable probability that

the result of the proceedings would have been different." *Ransom v. Johnson*, 126 F.3d 716, 721

(5th Cir. 1997).  A petitioner must show that the prejudice made the trial outcome "fundamentally

unfair or unreliable." *Id*. (quoting *Lockhart v. Fretwell*, 506 U.S. 364 (1993)).

     The state habeas court found as follows:

> 24.     The Court is familiar with Mr. Parks' reputation as a renowned criminal litigator in Texas and finds the affidavit credible.

*Ex parte Dorsey,* Application No. 67,702-02 at 477.

The state habeas court concluded:

> 3.     Applicant fails to prove his ineffective assistance of trial . . . counsel by a preponderance of the evidence. *Strickland v. Washington,* 466 U.S. 668, 689 (1984); *Hernandez v. State,* 988 S.W.2d 770, 770, 772 (Tex. Crim. App. 1999).

*Ex parte Dorsey,* Application No. 67,702-02 at 479.

Under AEDPA, this court  must give proper deference to the state court's determination that trial counsel rendered effective assistance. *See Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002). Because the state court properly identified *Strickland* as the governing legal principle, the "unreasonable application" prong of § 2254(d)(1) provides the standard that governs this court's review of the state court's decision on Dorsey's ineffective counsel claims. *Bell v. Cone*, 535 U.S. 685, 694-695 (2002).  This court must determine whether the state court's application of *Strickland* was objectively unreasonable. *Id.*; *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1104 (2003).  Under § 2254(d)(1), "[w]e have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of *Strickland* is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (quoting *Neal*, 286 F.3d at 236).  "The federal-habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

Dorsey alleges that his trial counsel rendered ineffective assistance in several respects.  Each is addressed below.

### A.     Counsel's Failures to Object

Dorsey identifies seven occasions during trial when his counsel failed to lodge an objection. (Docket Entry No. 1, Federal Petition, pp. 7, 10, 24, 26, 28, 33, 34; Docket Entry No. 2, Petitioner's Memorandum, pp. 11, 38, 41, 80, 81, 88).

### 1. Failure to Object to Videotape of Interrogation

Dorsey first alleges that his counsel failed to object on confrontation grounds to the video interrogation of C.D. The record shows that counsel made this objection in his motion to suppress. (Clerk's Record, Vol. I, p. 169). In his affidavit to the state habeas court, trial counsel stated:

> After having been served with this Court's order to respond to the enumerated issues, the trial attorneys have had the opportunity to review the germane portions of the Clerk's record, the trial transcript, exhibits, and the statement of facts from the pretrial Motion to Suppress hearing. Counsel feels that the 'denial of confrontation' issue was raised and litigated.

> Defense counsel believed at the time, and still consistently believes that a Motion to Suppress filed, heard, and adversely ruled upon, preserves error during trial, and requires no further objection.

> Counsel filed a Motion to Suppress the demonstrative video of [C.D.] handling a .22 pistol on the grounds that the video violated his right to confrontation and cross-examination under both the United States and Texas Constitutions, and for numerous other reasons. Additionally, the Motion to Suppress contains an allegation, and an objection, that the video tape is hearsay and counsel further objected, that the video contains verbal acts that could be construed as hearsay. The Court denied appellant's suppression request and objection in part and granted it in part.

> The copy of the Motion to Suppress is attached hereto, and the pertinent part incorporated herein, states as follows:

>> Motion to Suppress the [C.D.]/.22 video tape, [Ex. 1]. -- Defendant would also show that the said videotape should be suppressed on grounds, including but not limited to, that it does not show what it purports to show; that it is an invalid experiment; that it does not meet the requirements necessary for its admissibility into evidence; that it contains matters that deny

23

defendant his rights to confrontation of witnesses under the United States Constitution and the Constitution and statutes of the State of Texas; that it is irrelevant; that the said child witness is of such a young age that he cannot be found competent to testify; that the videotape is mere compilation of self serving hearsay created by the state to mislead the fact finder with invalid, unsubstantiated and misleading claims of scientific or technical expertise; that any probative value that the videotape may have for the fact finder is substantially outweighed by the danger of unfair prejudice; that it would result in confusion of the issues, misleading the jury, and the waste of judicial resources with undue delay.

The Motion was filed on February 2, 2001. [CR-1 154-172] The Court held the hearing on the Motion to Suppress on March 8, 2001 and the following witnesses testified at the Defendant's Motion to Suppress hearing regarding, inter alia, the video tape of [C.D.]

1. Detective David Moore,
2. Detective Melvin Franklin,
3. Peggy Frankhouser,
4. Kathleen Hamilton,
5. Audra Hough,
6. Bebe Durante,
7. John Micheaux,
8. Bonnie Tidwell,
9. Rex Frank, and
10. James McClure.

An objection to the denial of confrontation of the witness was made in the Motion to Suppress. The evidence of the effort made to suppress that tape was contained in the record testimony and argument of the hearing itself. In the Volume of the record titled 'Defendant's Motion to Suppress' (which takes up the majority of a volume), Defense counsel orally reiterated that the defense objected on confrontation grounds and that the actions on the video were 'verbal acts' constituting hearsay.

The Court did not rule at the conclusion of the Motion to Suppress but stated as follows:

"It is my feeling at this time that I am compelled to consider the video tape, and I'll take under

24

advisement the Court's ruling on your Motion to Suppress. We have the privilege of having some time, so I will promise you I will rule on it no later than next Tuesday."

On 3/13/01, the Court suppressed the audio portion of the video tape of [C.D.] and admitted the visual portion.

. . .

On the 8th day of March 2001 a hearing was held to consider Defendant's motions to suppress State's evidence in the above numbered and styled cause. The Court heard the motion to suppress regarding all of the following pertinent evidence: — the defendant's video interview with the Sheriff's Office, — the video experiment/interview of the child [C.D.] with the .22, — the warrantless search of the applicant's dwelling, — and the results of the seizure made with the search warrant.

Judge Reiter ordered the following:

"ORDERED, that the bulk of the audio portion of the video tape of [C.D.] is inadmissible, although under some circumstances, a portion may fall within an exception to the hearsay rule. The video portion of the tape is admissible."

After the Order, the defense, during trial, reminded the Court of the previous ruling and the issue of denial of cross. RR 6, p. 17, Mr. Parks:

When we addressed our motion earlier, the court had the motion hearing, we had indicated to the Court that there had been the term interview, and we had made our objections over the interviewing process and ensuing problems and difficulties with competence and swearing and cross-examination and the like . . ."

*Ex parte Dorsey*, Application No. 67,702-02 at 301-03.

The state habeas court found:

25.     Mr. Parks' affidavit contains the motion to suppress he filed in this case and relevant portions of the reporter's record.

26.    Based on his credible affidavit and on the motion to suppress, Mr. Parks objected to the videotape of Applicant's son, [C.D.], handling a firearm because, among other things, it contained hearsay and violated his right to confront the witnesses against him under both the United States and Texas Constitutions.

27.    Based on defense counsel's credible affidavit and Applicant's own admission in his memorandum of law, counsel argued to this Court during the suppression hearing that the admission of the [C.D.] video would amount to a denial of Applicant's confrontation rights because the "verbal acts" depicted in the video constituted hearsay.

*Ex parte Dorsey,* Application No. 67,702-02 at 477.

The Court of Criminal Appeals expressly based its denial of habeas relief on these findings. These determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Dorsey has not produced clear and convincing evidence to rebut these findings. The state court's decision that counsel provided effective assistance reasonably applied the law to the facts, consistent with clearly established federal law. Dorsey has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### 2.    Failure to Object to Narration

Dorsey alleges that trial counsel should have objected to Detective Tidwell's narration of the videotaped interview of C.D., on hearsay and confrontation grounds. (Docket Entry No. 1, Federal Petition, p. 10). During trial, the State offered into evidence the videotaped interview of C.D. showing him with a gun. The State argued that the videotape supported Dorsey's guilt, presumably because C.D. could not pull the trigger of that weapon. Trial counsel objected to the video as an improper experiment and on the basis of denial of cross-examination and confrontation. The trial court overruled those objections except as to the audio portion, which was not played for the jury. The State questioned Detective Tidwell about C.D.'s actions on the videotape. Dorsey asserts that

26

after several minutes of Detective Tidwell's narration, trial counsel objected on the basis of hearsay, without success. On appeal, counsel argued that the trial court had abused its discretion in admitting Detective Tidwell's hearsay testimony about the videotape. The Ninth Court of Appeals ruled that counsel's hearsay objection was not timely.

The record shows that as the videotape was playing, the prosecutor stopped it and asked Detective Tidwell about what was taking place. The prosecutor resumed the tape as Detective Tidwell described the events it showed. Dorsey fails to prove that he was prejudiced by his counsel's delay in objecting because the jurors were able to observe the videotape and reach their own conclusions. The record shows that the jury asked to view the videotape interview with C.D. during deliberations. (Reporter's Record, Vol. IX, p. 59).

The state habeas court found:

> 28. Based on the trial record, Detective Tidwell's narration of the events depicted in the [C.D.] video merely reiterated what the jury could themselves see while watching the video.

Ex parte Dorsey, Application No. 67,702-02 at 477. The Court of Criminal Appeals expressly based its denial of habeas relief on this finding. This determination is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Dorsey has not produced clear and convincing evidence to rebut this finding. The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. There is no basis for relief on this ground. 28 U.S.C. § 2254(d)(1).

### 3.    Failure to Object to the Revolver and Holster

Dorsey alleges that his trial counsel should have objected to the introduction of the .22 revolver and holster as irrelevant. Dorsey states that in opening, the State argued that the videotaped interview of C.D. with a .22 revolver proved that Dorsey was guilty of murder. The videotape

showed that C.D. could not pull the trigger of the .22 in double-action mode, although he did when the gun was in single-action mode. Dorsey states that later, during the defense's presentation of its firearm expert's testimony, the State argued that the .22 revolver was not the one used to kill Pamela Dorsey. Dorsey alleges that his counsel should have moved for a mistrial or objected to the gun and the videotape of C.D. interacting with the gun. Dorsey argues that the gun and the videotape misled the jury into believing that Dorsey shot his wife rather than believe the defense theory that C.D. accidentally discharged the firearm while playing with it.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel, strategically, did not move to withdraw the .22 revolver, nor move for a mistrial. Applicant admitted to Defense Counsel that the .22 revolver in the video is Pam's revolver. Pam carried that revolver in her purse. He told us that the revolver was carried in her purse and that when he entered the bedroom it was obvious to him that [C.D.] had gotten that revolver out of her purse and [C.D.] had accidently shot his mother with that revolver. Applicant told us that [C.D.] liked to play with that particular gun, that belonged to his mom, and would point it at people and play 'pow pow'.

> That revolver had a spent shell casing and was lying near Pam's body.

> THE .22 HANDGUN

> Bruce Zenor testified to that gun: [RR4, p. 40]

> Q    Can you identify in there where the holster is that you've referred to?

> A    It's right there.

> Q    Right. And can you also -- can you see in there anywhere where the pistol was?

> A    Here next to the bed and the night stand.

An assistant prosecutor swore to the following, consistent with what applicant told his attorneys:

"My name is Kathleen A. Hamilton, and I am the First Assistant District Attorney for the 9th Judicial District, Montgomery County, Texas[.]

The following information is known to me as part of a sworn statement made by Detective David Moore, Montgomery County Sheriff's Department. Upon his arrival, Deputy Zenor observed a .22 caliber hand gun on the floor near the head of the bed.

Mr. Dorsey stated that his wife, whom he identified as Pamela Gale Dorsey, was sleeping in the master bedroom with their 2 ½ year old son, known as [C.D.]. Mr. Dorsey said that he had been in the bedroom earlier, but had come out to do some paperwork. He said that he then heard a gunshot and ran to the bedroom and observed that his wife had been shot by his 2 ½ year old son. Mr. Dorsey said that he believed his son had emptied his wife's purse on the floor and found her handgun, removed it from the holster, and then shot his wife in the head."

That report is consistent with what we were told and consistent with the defense strategy.

That is the revolver that had the spent shell; it is the revolver that Pam owned; and it is the revolver that [C.D.] had played a game called "pow pow" with, in the past. It was the revolver lying by the body in the bedroom.

We had made the claim that was the revolver from which the bullet was fired, killing Pam Dorsey. If it was not, then our entire defense would have been vitiated. The Jury could have concluded then that another one of Charles Dorsey's firearms was used to shoot Pamela Dorsey and that someone must have disposed of or removed that particular firearm from the bedroom and either restored to its place of safekeeping, or hid or concealed it. Charles Dorsey being the only other adult in the house at the time of the shooting, would have been the one that the Jury would have concluded had fired the shot and hid or restored the weapon to its place.

29

> Our defense was only plausible if that weapon was the one from which the bullet was fired. Therefore our expert did all of his work and testing on that particular weapon. If we had challenged that weapon as not being the weapon from which the bullet was fired, the jury might conclude that a .22 bullet from a gun belonging to the defendant was the one that killed Pamela Dorsey, and our defense theory would have completely lost its foundation. Additionally, the expert work, testing, and testimony would have been for naught. The trigger pull evidence regarding that would then be totally irrelevant.

*Ex parte Dorsey*, Application No. 67,702-02 at 305-06.

The state habeas court found:

> 31.    Based on Mr. Park's credible affidavit and the trial record, counsel did not object to the admission of the revolver depicted in the [C.D.] video because the revolver's status as the murder weapon was essential to the defensive theory that [C.D.] shot his mother.

*Ex parte Dorsey,* Application No. 67,702-02 at 478. The Court of Criminal Appeals expressly based its denial of habeas relief on this finding. This determination is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Dorsey has not produced clear and convincing evidence to rebut this finding.

In assessing the reasonableness of Dorsey's counsel's performance, this court must indulge a strong presumption that the performance falls within the "wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689; *Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir. 1993). If counsel's action is based on well-informed strategic decisions, it is "well within the range of practical choices not to be second-guessed." *Rector v. Johnson,* 120 F.3d 551, 564 (1997) (quoting *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993)). The defense strategy was to argue that C.D. liked to play with his mother's gun. He often pointed his finger at her and yelled, "pow pow." Counsel argued that the fact the .22 caliber weapon was found on the floor near the bed

showed that C.D. had taken the gun out of his mother's purse and fired it, killing his mother.  To challenge the admission of the .22 caliber weapon would have undercut the defense strategy. Counsel's strategy falls within the wide range of reasonable professional assistance.  His decision not to object to the .22 caliber weapon falls within the range of reasonable trial strategy.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for relief on this claim.  28 U.S.C. § 2254(d)(1).

### 4.    Failure to Object to the Closing Argument

Dorsey alleges that his counsel was ineffective for failing to object to the State's reference in closing argument to Dorsey's invocation of his *Miranda* right to counsel.  (Docket Entry No. 1, Federal Petition, p. 26).  Dorsey alleges that his counsel had earlier failed to object to the State's improper questions about Dorsey invoking his *Miranda* rights, and that he again failed to object when the State used this information at closing arguments.  The State argued that Dorsey was not worried about his wife, but instead about whether he needed an attorney.  Dorsey argues that he had a constitutional right to counsel and the right not to incriminate himself, and that the State could not use the exercise of these rights to suggest his guilt.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel did consider the Prosecutor's mention during closing argument of the statement made by Chad Dorsey in his voluntary interview with Police when he asked whether or not he needed a lawyer. First the argument by the Prosecutor was based on evidence introduced in the trial which was a videotaped interview of Chad Dorsey.  And, in that interview Chad asked that question.  [It is admitted trial exhibit 7A.]

> Counsel filed a Motion to Suppress which included the suppression of exhibit 7, [later labeled (7A)].  When the hearing was held, the Court ruled that any mention of a polygraph should be

redacted, and some other references, but otherwise, over the objection of Counsel, the Court admitted the balance of the tape.  Since the tape was admitted into evidence, the question is on the admitted tape, and admitted evidence can be repeated during argument.

Further, the applicant did not want to take the witness stand. The voluntary statement that he gave to the Sheriff's deputy, did have some benefit in a sense, in that it gave the jury the opportunity to hear his side of the story; his defense to the murder charge, without the applicant having to withstand the rigors of the crucible of cross-examination.  He and the deceased were the only adults in the house, and his rendition on the tape provided the jury with his side of what happened that night.

*Ex parte Dorsey*, Application No. 67,702-02 at 306.

The state habeas court found:

32.    Based on Mr. Park's credible affidavit and the record, counsel did not object to the State's reference during closing argument to the fact that Applicant requested an attorney during his interview with police because it was a proper reference to evidence that had been admitted by the trial court.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.  The Court of Criminal Appeals expressly based its denial of habeas relief on this finding.  This determination is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  Dorsey has not produced clear and convincing evidence to rebut this finding.  The videotape of the police interrogation of Dorsey showed that he asked if he needed an attorney.  The videotape was admitted into evidence and was a proper basis for closing argument.  Counsel decided not to object to the videotape of the police interrogation because it contained Dorsey's own account of events on the night of the shooting.  Through the videotape, Dorsey was able to present his version of events without cross-examination.  Counsel's strategy falls within the wide range of reasonable professional assistance.  His decision not to object to the videotape of Dorsey's police interrogation falls within the range of sound trial strategy.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for the relief.  28 U.S.C. § 2254(d)(1).

### 5.    Failure to Object to Leading Questions

Dorsey alleges that his counsel failed to object to leading questions by the State relating to the strangulation of Pamela Dorsey.  (Docket Entry No. 1, Federal Petition, p. 28).  The prosecutor asked James Reid:  "Alright, Okay, and at this time of course, we know now she had suffered massive damage to her brain; okay?"  Reid responded: "That's what we assume."  The prosecutor asked the medical examiner, Dr. Parangao:  "Okay, would that be significant or would that not be significant to you in reaching your opinion that sometimes asphyxiation took place before death?"  Dorsey argues that Dr. Parangao did not directly answer that question.  Dorsey argues that the State misled the jury to believe that Dr. Parangao had found that Pamela Dorsey had not only been strangled, but strangled before her death, that is, that Dorsey had assaulted his wife before she was shot.  Dorsey maintains that there was no actual evidence that Pamela Dorsey was strangled, either before or after she was shot.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel did not perceive that the Prosecutor improperly insinuated that Pamela Dorsey had been strangled or asphyxiated, because there was evidence of that fact.  Medical Examiner Dr. Parangao reached the conclusion that because of the petechia of the eye, the bruising around the neck, and the linear mark along the neck, that strangulation or asphyxia was a possible cause.  Therefore, the insinuation was not improper, but was based upon a conclusion by a medical examiner.  Defense Counsel thoroughly cross-examined Dr. Parangao, and tried to impeach him through Dr. Ratalac.

> Dr. Parangao testified to the following: [RR 4, p. 99]

Q       What is the significance of finding a petechial hemorrhage in the part of the eye?

A       A forensic autopsy we always look for that, if it's in the eyes, we see it because that is a warning sign that this could be -- could be an asphyxial death.  But I see them most commonly, almost always, in manual strangulation, in lividal strangulation, or sometimes a car pressing your chest because you jack the car and it fall on you.  Those are asphyxial deaths, almost always.

A       In this particular case, the bruises on the strap muscle of the neck.   This one don't happen in an ordinary, simple tracheotomy by an expert.  Then the bruise, why there is a bruise in this area?  Why?  That's not a bruise of ordinary CPR.  It's too high.  They don't go that high.  There has to be something to cause the bruise, you know.  And the bruise did not happen by itself.  There's a pattern linearly towards the left side like that.  Something was there causing the bruise.  It does not exist by air, by itself.   Something cause that bruise. What is it?  Could it be anything?  You add them together, then you base your ideas, and they form your opinion.

Q       Were you able to develop an opinion about the cause of all these three things together?

A       If you add them together, the reasonable explanation that come to my mind, the petechia, the bruising of the strap muscle of the neck and the bruise around the neck, this probably -- something was put on the neck, pressure that caused it, cause it.  I don't think it's a manual, because in manual strangulation, I would expect the bruise on the shoulder to contain small curved abrasions the size of the fingernail, or scratch to the side, but not on the shoulder, but if you put your forearm on the neck, press your arm to the neck, to the shoulder, or the elbow there, that could have been -- that's the most logical explanation on my mind.  It would be explain all these findings on this particular case.

Q       Some other questions, Doc, are there always going to be signs of neck impression in a strangulation case or an asphyxia case?

A       No sir.

34

> Q        Why?
>
> A        You can have an asphyxia strangulation, of even an old lady. You put a very soft cloth and twist it on the neck, they will not give you a fight, and with enough to compress the breathing and the blood supply, and they get a little bit pressure, you have a dead body with petechia hemorrhage, bad heart, because old person is dead, and no injury in sight.
>
> Q        Alright sir.  And in this case we don't have external injuries on the anterior of Pamela Gail Dorsey's neck, but we do have the internal injuries, do we not?
>
> A        Well, I think there is external injuries, the bruise, you know.
>
> Q        Alright, I stand corrected.

*Ex parte Dorsey*, Application No. 67,702-02 at 309-310.

The state habeas court found:

> 34.       Based on Mr. Park's credible affidavit and the record, there was no reason to object to the State's questioning of Mr. Reid and Dr. Parangao regarding testimony that the victim had received a massive head injury and had been strangled, as these views were consistent with the adduced evidence.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  Dorsey has not produced clear and convincing evidence to rebut this finding.  The State presented the expert testimony of Dr. Parangao, who testified that Pamela Dorsey had petechial hemorrhages, hemorrhaging of the strap muscles in the neck, a bruise on the left side of the neck, and a bruise on the left side of her head.  Dr. Parangao testified that Pamela Dorsey was assaulted or strangled before the shooting.  The prosecutor's questions were based on evidence already presented to the jury.  Any objection to these questions would have been futile.  Counsel cannot be deficient for failing to press a frivolous point.

*Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *Green v. Johnson,* 160 F.3d 1029, 1036-37 (5th Cir. 1998), *cert. denied,* 525 U.S. 1174 (1999) (citing *Sones v. Hargett,* 61 F.3d 410, 415 (5th Cir. 1995)).

The state court's decision on the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for relief on this ground.  28 U.S.C. § 2254(d)(1).

### 6.     Failure to Object to Closing Argument About GSR

Dorsey claims his trial counsel was ineffective for failing to object to the State's closing argument on the basis that it went outside the record.  During closing, the State argued that C.D. could have had gunshot residue on his hands for many reasons.  "And I'm sure Charles Dorsey (Petitioner), knows that.  Of course you don't have to have that information to get a Federal Firearms Dealership, or Federal Firearms Dealer's License, but you sure pick that up if you've ever shot guns."

Dorsey argues that there was no evidence presented at trial that a person picks up knowledge of GSR dispersal ranges, patterns, testing methods, or ways to deceive GSR tests  conducted by DPS simply because that person has fired a gun.  Dorsey contends that the prosecutor meant to mislead the jury into believing that he knew how to evade the GSR testing.  The State essentially argued that Dorsey manipulated the GSR results to make it look as if C.D. had fired the weapon, to support the defense that C.D. had fired the fatal shot.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Defense Counsel was reluctant to raise the issue or to get into an  argument  concerning  this  issue  because  evidence  had  been introduced in this trial that Chad Dorsey is a Federally Licensed Firearms Dealer and has been for some time.  Dorsey has talked with Counsel about his knowledge of weapons as well as dealing, buying,

and selling weapons.  Counsel was charged with the prior knowledge that friends had indicated that he liked to go shooting.  It was our understanding based on trial preparation interviews and prior testimony, that he had an affinity for guns.

It was Counsel's belief that he had a superior knowledge of weapons because of his experience and because he was a Federally Licensed Firearms Dealer and dealt in weapons.  Counsel did not feel that objecting and raising a controversy at that moment was a good strategy.

License

Applicant was licensed by the Department of Treasury Bureau of Alcohol, Tobacco and Firearms as a Federally Licensed Firearms Dealer License number 5-76-170-01-6M-33986, [See trial exhibit number 76.]

The Declaration of the ATF states as follows: [RR 10, Ex. 76]

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS

I do hereby further certify that Charles R. Dorsey, 54 April Point North, Montgomery, Texas 77356, was a Federally licensed firearms dealer, License Number 5-76-1170-01-6M-33986, and was licensed with the Bureau of Alcohol, Tobacco and Firearms during the period November 27, 1990 through December 1, 1996.  I further certify that Charles R. Dorsey, 704 North Berry, Beeville, Texas 78102, application for license as a dealer in firearms other than destructive devices, pending license number 5-74-01-013-PA-38446 was withdrawn September 10, 1997.

And further shows:

EXCERPT FROM APPLICATION FOR LICENSE
DESCRIBE SPECIFIC ACTIVITY APPLICANT IS ENGAGED IN OR INTENDS TO ENGAGE IN, WHICH WILL REQUIRE A FEDERAL FIREARMS LICENSE (e.g., dealer in rifles, shotguns, revolvers, gunsmith, dealer in machine guns, etc.).

Dealer in rifles, shotguns, pistols and revolvers.

Therefore Counsel felt this was an issue better responded to than objected to during the final argument.  Additionally, at the time

> our strategy was that a Jury could conceive it as a logical inference
> from evidence throughout the trial that an individual who is actually
> a Federally Licensed Dealer of weapons would know that firearms
> emit a residue during the shooting of a weapon.  To espouse a
> contrary position might cause us to lose credibility with the jury.

*Ex parte Dorsey*, Application No. 67,702-02 at 313-14.

The state habeas court found:

> 40.    Based on Mr. Park's[sic] credible affidavit, counsel did not
> directly address the State's allegation in its closing that Applicant
> was familiar enough with guns to know about gun shot residue
> because counsel knew that Applicant did in fact have a superior
> knowledge of weapons.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1).  Dorsey has not produced clear and convincing evidence to rebut this finding.  The record shows that defense counsel made a tactical decision not to challenge the prosecutor's statement that Dorsey was familiar with guns.  Any argument by counsel that Dorsey was unfamiliar with guns and lacked knowledge of gunshot residue could easily be rebutted by the fact that Dorsey was a licensed firearm dealer.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for relief on this ground.  28 U.S.C. § 2254(d)(1).

**7.     Failure to Object to Closing Argument About Dorsey's Higher Levels of GSR**

Dorsey claims that his trial counsel was ineffective for failing to object to the State's statement during closing arguments that Dorsey's GSR test was substantially higher than Pamela Dorsey's. (Docket Entry No. 1, Federal Petition, p. 34).  During closing arguments, the State argued

that "[e]very one of those categories that they tested, except three, he's higher than Pam, substantially higher."  Dorsey argues that his GSR results were about the same level as Pamela Dorsey's.  Dorsey argues that the argument was meant to mislead the jury into believing that Dorsey, not C.D., fired the gun.

In his affidavit to the state habeas court, counsel testified as follows:

> Counsel did not object to argument of the prosecutor regarding the gunshot residue test results for applicant and Pam Dorsey because the exhibits reflect that the gunshot residue test results were higher for Pam Dorsey than for the applicant.  The quote by the prosecutor was "every one of those categories that they tested, except 3, he is higher than Pam, substantially higher.  Take it back there and look at it."

> The prosecutor was referring to trial exhibits number 114 and 115, the GSR test on both Pam Dorsey and Charles Dorsey.  Those documents were in evidence and the Jury had every right to review the evidence as the Prosecutor requested, and therefore the statement was not objectionable.  Those documents reflect that in 2 of those categories Pam was higher and in 1 they are the same.  In all of the other categories it appears that Charles Dorsey was higher.  Therefore, Counsel did not see that as objectionable, but as an area for response and rebuttal.

*Ex parte Dorsey*, Application No. 67,702-02 at 314-15.

The state habeas court found:

> 41.    Based on Mr. Park's credible affidavit and the record, counsel did not object to the State's claim in closing argument that Applicant tested higher than the victim for gun shot residue because in some of the tests Applicant did in fact test higher.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding. The finding is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  Dorsey has not produced clear and convincing evidence to rebut this finding.  Because the State presented evidence

that the gunshot residue results for Dorsey were higher than for Pamela Dorsey on some of the tests, counsel made a tactical decision not to object.  The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for the relief he seeks on this ground.  28 U.S.C. § 2254(d)(1).

### B.      Failure to Request A Hearing

Dorsey alleges that his trial counsel failed to request a hearing to determine if C.D.'s nonverbal conduct on the video amounted to hearsay.  (Docket Entry No. 1, Federal Petition, pp. 11, 22; Docket Entry No. 2, Petitioner's Memorandum, p. 12).  In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel did request a hearing to determine whether [C.D.]'s action on video tape amounted to hearsay, and the court allowed the hearing.  The hearing on the issue of the denial of confrontation and hearsay nature of [C.D.]'s video was held on March 8, 2001.  The following witnesses testified: Detective David Moore, Detective Melvin Franklin, Peggy Frankhouser, Kathleen Hamilton, Audra Hough, Bebe Durante, John Micheaux, Bonnie Tidwell, Rex Frank, and James McClure.

> The Hearing was held and was to determine, inter alia, whether [C.D.]'s actions on the videotaped[sic] amounted to hearsay and a denial of confrontation.  The evidence and arguments appear to take up 216 pages of a volume entitled Defendant's 'Motion to Suppress'.

> Defense Counsel was able to present witnesses, cross-examine witnesses, and a total of 28 exhibits were offered and admitted at the Motion to Suppress hearing.  The Trial Court suppressed the audio portion of the video, but ruled that the Jury could watch the videotaped portion.  The Court overruled appellant's objection that the video portion included verbal acts which themselves were hearsay.

*Ex parte Dorsey*, Application No. 67,702-02 at 303-04.

The state habeas court found:

> 29.     Based on the trial record and Mr. Parks' credible affidavit, counsel used the suppression hearing to litigate the issue of whether [C.D.]'s actions on the video amounted to hearsay."

*Ex parte Dorsey*, Application No. 67,702-02 at 477.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Dorsey has not produced clear and convincing evidence to rebut this finding. The record shows that counsel filed a motion to suppress the videotape of C.D. as hearsay. The trial court conducted a hearing on the motion to suppress on March 8, 2001. (Clerk's Record, Vol. I, pp. 154-76). Dorsey's claim that counsel failed to challenge the admission of the videotape is contradicted by the record. The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Dorsey has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### C.     Failing to Question Witnesses

#### 1.     Ivan Wilson

Dorsey claims that defense counsel failed to question the State's gunshot residue expert about why he notified the district attorney's office that C.D. tested negative for gunshot residue. Dorsey argues that the expert knew that C.D. had tested positive. (Docket Entry No. 1, Federal Petition, p. 24). Dorsey explains that the State claimed that the bullet discharged from the .22 caliber firearm was "CCI" ammunition, which did not contain antimony. The expert testified that he told the prosecutor's office that the GSR tests on C.D. were negative, which led to the State's conclusion that C.D. did not discharge a firearm on the day of the incident and that Dorsey had fired the fatal bullet. Dorsey alleges that his counsel failed to ask the expert why he did not tell the DA's

41

office that C.D. tested positive for the chemicals that are used in CCI ammunition.  The record

shows, however, that counsel did reveal through questioning the expert that the DPS policies in

effect at the time required a negative result if the test did not show significant levels of all three

chemicals normally found in ammunition, including the ingredient missing from CCI ammunition.

Dorsey argues that through proper questioning, counsel could have stressed that despite the negative

result, C.D. tested positive for the same GSR compounds that were recovered from the CCI shell

casing.  Dorsey argues that it was not until his third trial that he learned that C.D. tested positive for

CCI ammunition GSR.  Dorsey complains that the State relied on false facts.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel did challenge the State's Gunshot Residue Expert, Ivan Wilson concerning the expert's initial reports.  The pertinent questions and answers of Counsel's cross-examination have been copied and are attached hereto.  (Ex. 4)

> Defense counsel had exposed the nuance of Ivan Wilson's report initially.  Counsel was aware of the elements of which CCI ammunition is composed, and used that information during cross examination.  Since this was the third trial and counsel had prepared for two jury trials in this case; and had worked on this issue with our own consulting and testifying expert . . . counsel felt comfortable with the issue of why Ivan Wilson reached the conclusion he did. Counsel had Wilson testify to the elements of CCI and the elements of other gun powder, in order to expose to the jury why he reached his  conclusion.

> The last paragraph of his report indicates the reasons and rationale why he reached the decision he postulated.  One of the theories he lists as a basis for his conclusion is that the CCI .22 brand of ammunition does not have antimony.

> It is apparent from the cross that the State's witness was not familiar with the company, Cascade Cartridge Industries.  The Gunshot Residue Expert for the State was cross-examined on that issue, and the issue was additionally covered by the defense expert on gunshot residue.

His testimony is attached as Ex. 4 and the following can be found at page 175—

> Q    And had you known it was CCI ammunition, presumably you would have told the District Attorney's Office, "Listen, this is a negative test, but you guys need to be aware there's no antimony in CCI."?
>
> A    That in general terms was stated in my report . . .

*Ex parte Dorsey*, Application No. 67,702-02 at 304.

The record shows that counsel questioned the State's expert, as follows:

> Q    Now if there is no gunshot residue or primer residue, then that would mean that somebody either didn't fire a weapon, or the weapon didn't discharge any gunshot residue, or they weren't in the present when it did discharge, is that correct?
>
> A    Or that it was removed.
>
> Q    Or it was removed.  And we have in the primer, let's see, barium, lead and antimony, correct?
>
> A    Correct.
>
> Q    Okay.  And for a positive test, for a positive test you would have to get barium, lead and antimony, and you'd have to have all three in sufficient quantities, in excess of your minimum, to say it was positive.
>
> A    Yes sir.
>
> Q    And if you were to tell a jury it was positive, what you would be telling them, Ivan, is that this person either fired a weapon or was in close proximity of a weapon when it was fired, or handled the weapon after it was fired.
>
> A    Yes sir.
>
> Q    Okay.  Now, CCI ammunition does not contain antimony, does it?

A       Yes, I believe that's correct.

Q       And if you were to get, on any particular test, you were to get less than these three checks, these chemicals in the minimum amounts, you would consider it a negative test.

A       Yes sir.

Q       Okay.  Would you agree that you informed this District Attorney's Office that [C.D.] was negative on the gunshot residue test in your report?

A       Yes.

Q       But would you agree also with me that every single person who has ever fired a .22 rimfire CCI cartridge has turned out to be a negative?

A       I have not tested that far.  I would say that in my experience, that's correct.

Q       And they always would, because there's no antimony in CCI, right?

A       Correct.

Q       And you'd have to have CCI to get a positive.  I mean, you'd have to have antimony to get a positive.

A       Yes sir.

Q       In any of your studies and in your work with any law enforcement agency, has anyone ever said during one of your meetings or something, "Listen, you guys, we're never, ever going to get a positive with CCI.  There's no antimony in it."? No one ever said that?

A       I think they're aware of that, yes.

Q       But at the time you returned your report to this District Attorney's Office, and you told them that [C.D.] was negative for gunshot residue, you didn't even know that you were testing CCI ammo, did you?

A       No, but in my statement was that one of the possibilities for the negative result is that .22 caliber ammunition may not have antimony present.  My report's up here, sir.

Q       Oh yeah, I knew when I sat down.  I'm sorry.  What your statement says, basically from your report is "We weren't able to identify antimony in sufficient quantities to establish the presence of gunshot primer residue on the hand swabs from the person of Conner Dorsey."  So you told this District Attorney's Office, as per your protocol -- I'm not challenging it - as per your protocol, you informed this District Attorney's Office that [C.D.] did not have sufficient antimony to have a positive test, therefore he was negative for gunshot residue.

A       That's correct.

Q       But the truth of the matter is the ammunition in that gun did not have antimony in it to begin with, correct?

A       Correct.

Q       And the shell casing that you swabbed for gunshot residue also didn't have antimony, did it?

A       Yes, there was a swab submitted.  I physically didn't swab it myself.  There was a swab submitted and it had presence of barium and lead, but not antimony.

Q       So the shell casing didn't have antimony, [C.D.] didn't have antimony, but that's because there's no antimony in that shell, right?

A       Yes.

Q       And had you known it was CCI ammunition, presumably you would have told the District Attorney's Office, "Listen, this is a negative test, but you guys need to be aware there's no antimony in CCI"?

A       That in general terms was stated in my report when I said that .22 caliber ammunition, and it's not just specifically CCI ammunition, does not always have antimony.

Q       Okay, and that's in your report?

A       One of the reasons, yes.

Q       No, is that in your report?

A       Yes sir.

(Reporter's Record, Vol. V, pp. 172-76).

The state habeas court found:

> 30.       Based on Mr. Park's credible affidavit and the trial record,
> counsel effectively cross-examined the State's firearms expert on the
> possibility that [C.D.] could have tested negative for gun shot[sic]
> residue because of the type of ammunition used.

*Ex parte Dorsey*, Application No. 67,702-02 at 477.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding.

This finding is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  Dorsey has not

produced clear and convincing evidence to rebut this finding.  This court presumes that counsel's

performance falls within the wide range of reasonable professional assistance.  Dorsey has not

shown a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  Dorsey does not explain how further questioning would have

altered the outcome at trial.

The state court's decision as to the effective assistance of counsel reasonably applied the law

to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for relief

on this ground.  28 U.S.C. § 2254(d)(1).

### 2.       Peggy McRae

Dorsey also alleges that his trial counsel failed to impeach State witness Peggy McRae.  She

testified that she remembered renting the movie "Never Talk To Strangers" to Dorsey.  (Docket

Entry No. 1, Federal Petition, pp. 31-32).  Dorsey states that the State improperly called McRae, the

video store rental clerk, to testify as a rebuttal witness.  McRae testified about the plot of the movie "Never Talk To Strangers," in which a father used his child to shoot the mother.

On November 13, 2001, McRae testified that she did not remember renting the video to Dorsey.  The next day, McRae testified that she did remember renting the movie to Dorsey.  She identified Dorsey in court.  Dorsey argues that counsel failed to impeach McRae with her previous day's testimony.  Dorsey claims that when counsel questioned McRae about her contrary testimony in another trial, McRae maintained that she did remember Dorsey renting this video.  Dorsey argues that this left the jury with the impression that Dorsey rented that movie and therefore probably watched it and got the idea to blame his son for the shooting death of Pamela Dorsey.  Dorsey argues that there was no evidence showing that he – as opposed to another member of the family – rented the movie.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel did impeach Peggy McRae with her contradictory testimony.  We did so using the contradictory testimony from a prior trial in which Ms. McRae had testified under oath.
>
> However Peggy McRae's testimony at trial left room for her to clear up her testimony from one question to the next because the question was initially asked in a very general term and referred to multiple rentals taking place over the course of several months.  The prosecutor first asked Peggy McRae if she could identify the actual renter of all the movies on the card from March to May.  A few questions later he asked her if she could identify Chad Dorsey as the one who had rented "Never talk to Strangers", the movie in issue.  When he asked about that specific movie she detailed the circumstances that caused her to remember that Chad Dorsey was the renter.
>
> Since the Jury had heard the testimony on direct and there was an explanation of transitioning the question from 'general rentals' over the course of a few months down to one specific rental, Defense Counsel believed that the more effective cross examination would be to impeach Peggy McRae with her prior testimony.  The

jurors themselves, as judges of fact, could make their own determination that the testimony was inconsistent from having heard it.

Defense counsel emphasized her prior trial testimony and laid the predicate for a prior inconsistent statement, and was able to show the Jury that in a prior testimony under oath, she had made the claim that the movie had been rented by either Chad Dorsey or one of the other family members on the Dorsey's account.

Therefore, Defense Counsel felt that the point was made that she had gone from general to specific in her testimony before that very same Jury, and that on a prior occasion under oath that she had testified differently as to the specifics as to who rented "Never Talk to Strangers", and that made the prior testimony the valuable impeachment testimony.  The colloquy went as follows:

Video Rental Clerk

Peggy McRae testified as follows: [RR7, p. 246]

A      This is an invoice showing that all the rentals that Pamela and Charles Dorsey had during this period of time, and its dated June, 1996.

Q      Does it show rentals for the period of from March to say May 6th?

A      Yes.

Q      And specifically referring to the front part of that, you personally recall having rented Charles Dorsey those videos that are reflected there?

A      No sir, I can't say that I personally recall those particular videos, when he rented them.

[RR 8, p. 7]—(Referring to 'Never Talk to Strangers')--

Q      Do you remember who rented that movie from Take One Video?

A      Charles Dorsey rented this movie.

Q      And from you

A     Yes sir.

THE CROSS EXAMINATION--

Q     So let me turn to 184, then back to 189, and ask you, ma'am, if you haven't told me in the past about this same issue that you actually rented this movie to Mrs. Dorsey, Pam Dorsey and Chad Dorsey?

A     Okay.  No sir, I don't recall saying that.

Q     But you did say it, at least it reflects it here, is that correct?

A     Yes sir.  I said that -- oh, I'm sorry.

Q     Okay.  But do you recall at some point telling other people under oath, at a different time in this case, that you had rented the movie, as best you recall, to Mr. and Mrs. Dorsey?

A     I don't recall that.

Q     But it does say that there, doesn't it?

A     Yes, it does.

Q     Okay.  It does say, and you were testifying under oath, weren't you?

A     Yes sir.

Q     Okay.  "Mr. and Mrs. Dorsey had signed for the video, the original receipt."  Correct?

A     I'm sorry, I don't recall that.

Q     But it says that you said that under oath, is that correct?

A     Yes sir, it does say that.

[Q]     -- It had my name on it as being -- my name, meaning you.

A     Exactly.

Q     -- as being the person that had rented them the video, correct?

A       Exactly.

Q       And the "them", I guess would refer back up to Mr. and Mrs.
        Dorsey, who you had claimed at that time to have rented the
        video to, is that correct?

A       Yes Sir.

Q       Well, isn't it a fact you told us in the past that the only reason
        that you remember renting this movie at all is because you
        saw the receipt?  Isn't that correct?

A       Yes sir.

Q       And didn't you tell us before that you'd rented at least 25
        videos on that day?

A       Probably, so that would be accurate.

Q       And that would be pretty much an average for you, is that
        correct?

A       Yes sir.

Q       And that you don't really remember which video, which
        movie you rented to any particular individual at the time, do
        you?

A       No sir.

Q       And all of a sudden, isn't it a fact, Ms. McRae, that the
        receipt that would show us who would have rented the video
        is gone?

A       I don't know.

Q       You don't have it, do you?

A       I don't have it, no.

*Ex parte Dorsey*, Application No. 67,702-02 at 310-13.

        The record shows that defense counsel impeached McRae on whether she remembered

renting the movie to Dorsey.  (Reporter's Record, Vol. VIII, pp. 7, 17).  Through his cross-

examination of McRae, defense counsel also tried to show that the movie was popular because of the actors and because it contained nudity and love scenes, and that many people rented it. Defense counsel made a tactical decision to impeach McRae with her prior inconsistent statements rather than question her about why she remembered renting the movie to Dorsey. On direct examination, McRae testified that she remembered renting the movie to Dorsey. She explained that she rented the movie "Never Talk to Strangers," to Dorsey on May 5, 1996, and one week later she read that Pamela Dorsey had been killed. On her own initiative, McRae checked the rental records, alerted her supervisor, and contacted the police. Defense counsel chose not to focus on why McRae remembered renting the movie to Dorsey. Doing so would have drawn further attention to the fact that Dorsey's wife was killed in a manner similar to that shown in the movie. Defense counsel made a tactical decision not to elicit responses that would tend to support the State's theory of the case.

The state habeas court found:

> 39.   Based on Mr. Park's [sic] credible affidavit and the record, counsel impeached Peggy McRae on whether she had rented the movie "Never Talk to Strangers" to Applicant with her testimony in a previous trial.

*Ex parte Dorsey*, Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Dorsey has not produced clear and convincing evidence to rebut this finding. The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Dorsey has not shown a basis for relief on this ground. 28 U.S.C. § 2254(d)(1).

### D.   Failure to Request a Mistrial

Dorsey next alleges that his trial counsel was ineffective for failing to move for a mistrial "after the State claimed that they were no longer claiming that the .22 was the firearm used to kill the Complainant."  (Docket Entry No. 1, Federal Petition, p. 24).  Dorsey points out that during opening arguments, the State argued that a videotaped interview with C.D. showed that he could not pull the trigger in double-action mode, and, therefore, that Dorsey was guilty of murder.  Later, during the defense's presentation of expert testimony, the State disclaimed that the .22 revolver was the one used to kill Pamela Dorsey.  Though counsel indicated that he would move for a mistrial, he never did so.  Dorsey argues that the videotape of C.D. misled the jury into believing that Dorsey deliberately shot his wife, rather than believing the defense theory that C.D. accidentally discharged the firearm while playing with it.

The record provides no support for Dorsey's  claims.  The following exchange took place during the defense case:

> MR. McDOUGAL:  . . . Insofar as they relate to, or his testimony concerns the amount of gunshot residue on anybody's hands as a result of firing that weapon, I'm going to object to it because it is based upon the supposition that that weapon was in fact fired by those individuals, and that's what they would like to have the jury believe. That gun has not been tested to see if it leaves a residue at all.  So I think the basis on which they're doing is not -- hasn't reached it's proper conclusion -- when referring to another test on the gun.

> MR. CAMARA:  Your Honor, this is a little bit ridiculous at this point, after they've introduced this gun.  We've been here for a week with testimony concerning this gun.  It was the gun that's purported to have been used in this particular incident and it's the State's evidence.  The State has brought in the DPS man who testified from these documents, referred to these documents, gave us a copy in Open Court from this file, which the Court ordered him to make a copy of it and give it to us for purposes of this expert to testify from. So it's a little bit -- it's a little bit silly and disingenuous for the State now to stand up in front of this jury and try to tell them that the Defense has failed to do something when in fact it's their evidence

we're using. Now if they've lied to this jury and none of this evidence is relevant, I move for a mistrial on it.

MR. McDOUGAL: Well, Number 1, Judge he's called me silly; Number 2, he's called me -- I don't know what the other one was. Now he's accused me of lying to this jury. All we have said about State's Exhibit 46 is it was found at the scene. That's all we've said. That's all any witness has said. They have said nothing about whether that gun is the one that actually killed Pamela Dorsey or not. As you recall, the fragments in her head were too shattered to match to that gun. That's the evidence this jury has.

MR. CAMARA: And Your Honor, the evidence we're attempting to present now is in response to the evidence that they've presented. Now if the jury decides that this gun was not in fact used, or this incident never in fact happened, then that's a question for the jury to decide. But the State can't stand here and say that we shouldn't have the opportunity to testify and present evidence concerning the evidence that they've presented. And under the Rules of Evidence, we're entitled to do that, and that's all we're asking, to go ahead and present the evidence to the jury and let the fact finders decide what they determine that the facts in this case are.

MR. McDOUGAL: Well, I'm more than willing to go to any place that Mr. Ernest cares to -- I mean, and fire that gun and see if it leaves residue, and that's all I'm asking, and I'll do that if the Judge -- if you give us 30 minutes we can have it done. We can have the results back tomorrow.

THE COURT: Very well. The objection is overruled. I note your exception. You may proceed. They will be admitted, . . .

(Reporter's Record, Vol. VII, pp. 115-18).

Counsel asked the defense expert to give his opinion about the firing of the weapon on May

14, 1996 based on his gunshot residue analysis. The following exchange took place:

MR. McDOUGAL: Objection. He hasn't test fired that gun, so he doesn't know how much residue that gun will leave and I'll object to it based on facts not in evidence, based on evidence outside the knowledge of this person asked to give their opinion.

THE COURT: Now what is your response to that, sir? Why would that --

MR. CAMARA:  My response is that --

THE COURT:  Why would that opinion be admissible?

MR. CAMARA:  [T]he opinion is admissible because based on this gunshot residue analysis and the gunshot residue analysis done by DPS, that he can form an opinion based on that underlying data as to who fired that weapon or what took place in the firing of that weapon because the evidence has been well documented throughout the trial of what circumstances were involved.  There were only three people in that home.  There was only -- and all of that evidence presented in this Courtroom in this particular trial.  And based on that scenario, and this particular testing done by the Department of Public Safety, he can draw an inference and give an opinion based on this evidence.

MR. McDOUGAL:  Number 1, the only evidence in this case that that gun was used to kill anybody came from that man right there. Number 2, DPS did not ever say who fired the gun or what evidence was consistent with what because they did not test fire the gun to determine if it's capable of leaving the amounts of residue that they've shown on the exhibits.  Number 3, he specifically has never done it, so he's definitely not qualified to give that opinion.

THE COURT:  Well, I tend to think –

MR. McDOUGAL:  And also, it invades the providence [sic] of the jury, Your Honor.

THE COURT:  Well, I wondered about that.  I tend to think though, that goes to the weight rather than the admissibility, so I most respectfully will overrule the objection and permit him to answer that question.

(Reporter's Record, Vol. VII, pp. 146-148).

Dorsey relies on these arguments between trial counsel and the prosecution relating to the State's objections to evidence submitted by the defense.  (Reporter's Record, Vol. VII, pp. 116-17, 147; Fed. Writ Pet. at 24).  The trial court overruled the State's objections.  As discussed in Section IV-A-3, Dorsey's counsel did not object to admission of the .22 caliber weapon because it was central to the defense.  For the same reason, counsel did not move for a mistrial.

The state habeas court found:

> 31.    Based on Mr. Park's credible affidavit and the trial record,
> counsel did not object to the admission of the revolver depicted in the
> [C.D.] video because the revolver's status as the murder weapon was
> essential to the defensive theory that [C.D.] shot his mother.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.  The Court of Criminal Appeals expressly based

its denial of habeas relief on this finding.  This finding is entitled to a presumption of correctness.

28 U.S.C. § 2254(e)(1).  Dorsey has not produced clear and convincing evidence to rebut this

finding.  The record shows that defense counsel made a tactical decision not to move for a mistrial

based on admission of the .22 caliber weapon because that weapon was central to the defense theory

that C.D. pulled the trigger.  Counsel's strategy falls within the wide range of reasonable

professional assistance and his decision not to object to the .22 caliber weapon falls within the wide

range of sound trial strategy.

The state court's decision as to the effective assistance of counsel reasonably applied the law

to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for the

relief he seeks.  28 U.S.C. § 2254(d)(1).

### E.    Failing to Request a Limiting Instruction

Dorsey alleges that his counsel was ineffective for failing to request a limiting instruction

on the use of the videotape interview of C.D.  (Docket Entry No. 1, Federal Petition, p. 25).  Dorsey

argues that the videotape showing C.D. with a .22 caliber revolver was meant to convey to the jury

that C.D. could not pull the trigger, but the State later changed its position and asserted that the .22

revolver was not the firearm used.  Dorsey complains that his counsel failed to ask that the jury be

instructed that they were to consider the videotape and the evidence involving the .22 revolver only

if they found beyond a reasonable doubt that the gun on the videotape was the gun that shot Pamela

Dorsey.  Dorsey argues that the jury should have been instructed that if it determined that the .22 caliber weapon was not used in the shooting, then the jury could not consider the .22 caliber weapon, the holster, or the videotape for any purpose.

The record shows that the trial court instructed the jury that it could consider only the evidence in the record in reaching its verdict.  (Clerk's Record, Vol. I, pp. 346-50).  The jury heard testimony that the .22 caliber weapon was found on the floor near the bed where Pamela Dorsey had been shot in the back of the head.  The defense theory was that C.D. removed the gun from his mother's purse and shot his mother in the back of the head as she was sleeping.  The defense presented testimony that C.D. often played "pow pow," a game in which he pretended to hold a gun and shoot.  The defense theory rested on C.D. firing the .22 caliber weapon.  The jury did not hear that any other guns were present in the bedroom or that C.D. may have fired another gun.  The only weapon the jury heard about was the .22 caliber gun that belonged to Pamela Dorsey.  Defense counsel wanted the jury to focus on the .22 caliber weapon.  There was no basis or need to instruct the jury that it could consider the videotape and the evidence involving the .22 revolver only if it found beyond a reasonable doubt that it was the firearm that killed Pamela Dorsey.  Such a limiting instruction would have undercut the defense that C.D. fired the .22 caliber weapon.

The state habeas court found:

> 31.    Based on Mr. Park's credible affidavit and the trial record, counsel did not object to the admission of the revolver depicted in the [C.D.] video because the revolver's status as the murder weapon was essential to the defensive theory that [C.D.] shot his mother.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.  The Court of Criminal Appeals expressly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  Dorsey has not produced clear and convincing evidence to rebut this finding.

Dorsey has not explained how an additional limiting instruction would have altered the outcome at trial.  The state court's decision on the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for the relief he seeks.  28 U.S.C. § 2254(d)(1).

> **F.      Failing to Strike Jurors for Cause**

Dorsey alleges that his trial counsel was ineffective for failing to challenge certain jurors for cause.  (Docket Entry No. 1, Federal Petition, p. 29).  Dorsey notes that Juror #14 stated that he had seen something about Dorsey's case during his lunch break but did not say whether that would affect his verdict or deliberations.  Dorsey states that this juror stated during voir dire that he was not sure if he could be pressured to vote a certain way, one way or the other, by other jurors.  The record shows that when this juror was asked, "[w]ould the fact that you were in the minority, without deliberations and all, I don't want to talk about that, it's just the fact that you were in the minority, would that make you want to change your vote?"  (Reporter's Record, Vol. II, p. 187).  This juror responded, "I don't know" while the trial court sustained the State's objection to the question.  *Id*.

Dorsey alleges that Juror #29 stated that she thought Dorsey should not be presumed innocent and that the State and the defense would have to prove he was not guilty.  This individual was seated as a juror.  Dorsey asserts that her views violated his constitutional right to a fair trial.  But the record does not support the claim of juror bias.  The juror's responses indicate that she thought that "an even playing field would be a little bit more equitable."  (Reporter's Record, Vol. II, pp. 146-47).

Dorsey has not shown that either juror had a bias against him or that they otherwise qualified for a challenge for cause under Texas law.  The state habeas court found:

36.     Based on the trial record, Venire member [14] was not allowed to respond to counsel's question about whether the venire member would feel pressured to change his decision in light of other jurors' opinions.

37.     Nothing in the record suggests that [Juror 29], who was on the jury, did not follow the law as established in the jury charge.

38.     Applicant provides no proof that [Juror 29] did not follow the law as established in the jury charge.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on these findings. These findings are entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1)  Dorsey has not produced clear and convincing evidence to rebut these findings.  Dorsey has not shown how counsel's failure to challenge either of these two jurors for cause would have altered the outcome of his trial.  Even if counsel had made the requested challenges for cause, Dorsey has not shown that the trial court would have stricken these jurors.  The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Dorsey has not shown a basis for relief on this claim.  28 U.S.C. § 2254(d)(1).

## G.     Failure to Obtain a Defense Expert

Dorsey alleges that his trial counsel was ineffective for failing to obtain a qualified forensic pathologist to testify as a defense expert.  (Docket Entry No. 1, Federal Petition, p. 27).  Dorsey states that his counsel obtained a clinical pathologist, Dr. Ratalac, to testify for the defense.  Dorsey argues that clinical pathologists deal with mostly hospital deaths, not traumatic deaths involving shootings.   As a result, according to Dorsey, Dr. Ratalac was effectively cross-examined on his qualifications to testify about this shooting death.  Dorsey explains that Dr. Ratalac was able to testify in support of the defense theory that Dorsey did not assault or choke his wife before the

shooting.  Dorsey contends that although Dr. Ratalac's testimony supported the defense, the State's impeachment of his qualifications effectively undermined this testimony.

In his affidavit to the state habeas court, defense counsel testified as follows:

> Counsel considered Dr. Ratalac qualified as an expert and he was allowed to testify in this Court as an expert.  Dr. Ratalac is a doctor, a lawyer, pathologist, and a professor.  As a law student, he went to school with the Judge.

> Dr. Ratalac was an Assistant Medical Examiner in Clark County, Nevada (Las Vegas).  As a medical examiner, he has preformed[sic] thousands of autopsies.  Counsel considered Dr. Ratalac imminently qualified because of his history of a pathologist, professor, lawyer, and medical examiner.

> Dr. Ratalac testified to his qualifications:  [RR 7, p. 164]

> A    I'm a pathologist . . . I'm in a large group.  We do pathology services at St. Joseph's Hospital in Houston, St. Catherine Hospital in Katy and St. John in Clear Lake.

> Q    And what is your educational background?

> A    I'm a Doctor of Medicine.  I graduated from (inaudible) Medical School in 1957.  I interned in Charity Hospital in New Orleans.  I took a four year residency program in the specialty of Pathology.  The first year was at Columbia Presbyterian Medical Center in New York.  The second year was in Vargas Hospital in the Panama Canal Zone.  The third and fourth years were back on staff at LSU in the Pathology Department.

> Q    And have you taught at various institutions?

> A    I have.

> Q    What are some of those?

> A    I taught at Columbia TNS, it's called.  It's their medical school in New York.  I taught at LSU Medical School in New Orleans.  I taught at Baylor Medical School in Houston. . . .

Q        And in your past experience have you also served as medical examiner in a medical examiner's office?

A        I have.

Q        Where was that?

A        I was Chief Deputy Medical Examiner in Clark County, Nevada, which is Las Vegas for all practical purposes.

Q        And what was the medical examiner's duties?  What were your duties in the Medical Examiner's Office?

A        I was kind of second in command of the office.  We had the usual medical examiner types of responsibilities.   We investigated suspicious deaths, deaths that were clearly homicides, suicides, traumatic events, maternal mortality, therapeutic misadventures and things like that.

Q        And in your past experience have you performed autopsies?

A        I have.

Q        How many, roughly, autopsies have you performed?

A        Oh, several thousand probably.

Q        And do you still perform autopsies?

A        I do.

Q        Do you also consult with other pathologists concerning autopsies?

A        I do.

Q        And have you spent time as a consultant on evaluating results of autopsies, cause of death and manner or means of death?

A        I have.

Q        Let me ask you also, in regard to your education, do you have any other specialized education in addition to your medical background?

A.      I do[.]

Q       What is that, sir?

A       I'm a lawyer.

Q       And did you go to law school?

A       I did[.]

Q       Where did you go to law school?

A       I went to the University of Houston Law School in Houston.

Q       As a matter of fact, the Judge was one of your Classmates, wasn't he?

A       Yes.

*Ex parte Dorsey,* Application No. 67,702-02 at 307-08.

Dr. Ratalac testified that the petechial hemorrhages in Pamela Dorsey's eyes could have been caused by vomiting.  He testified that the autopsy report showed that Pamela Dorsey had vomited at some point.  (Reporter's Record, Vol. VII, p. 200).  Dr. Ratalac testified that the hemorrhaging in the strap muscles of the throat could have been caused by the vigorous attempts by the EMS workers to insert a tracheal tube through the mouth.  He explained that the forceful extension of the neck could have caused injury to the strap muscles.  (*Id*. at 202).  Dr Ratalac also explained that the tracheostomy involved cutting blood vessels in the area of the strap muscle hemorrhage.  Dr. Ratalac opined that the light blue purple contusion on the left side of the neck was the result of lividity.  (*Id*. at 204).

Counsel questioned Dr. Ratalac about the injuries:

Q       Now, do you think that those particular injuries, the petechia, the strap hemorrhaging and the so called bruise on the left side of the neck, were caused by someone exerting a forearm on the throat of Pamela Dorsey?

A       I mean, it's kind of speculation.  It's -- I would think not quite enough to produce these effects, but I don't know.  I mean, I don't know how much force was applied, how long it was held there.  It's just kind of a guess.

Q       So you would think that would be rank speculation to --

A       Well, I don't see how we could get there from here.

Q       Now each one of those injuries, the petechia, the hemorrhaging of the strap muscles, and the bruising if there is bruising on the left side of the neck, any one of those and any and all of those could have been caused by something other than exerting force to the neck area, is that what you're saying?

A       Yes.

Q       Specifically, could these type of injuries have been caused by what resulted from the gunshot wound to the back of the head?

A       Well, I think the petechial hemorrhages could certainly have resulted from that.

Q       Why?

A       Well, as we discussed, when in you introduce this bullet into the brain, you have a lot of pressure changes, the brain swelling, we have bleeding, and it just is a tailor made situation for the rupture of small blood vessels because of the intense changes in the hemodynamics of the blood system in that area.

Q       Could it also have been -- and I'm changing the subject a little bit, not talking about petechia anymore, but could the bruising on the left side of  the neck, could that have also been caused by the fact of the EMS technicians trying to exert force on her neck by stretching it and creating tension in order to put a jugular IV in?

A       I don't know.  I mean, I can't say it couldn't happen.  The jugular vein is a little bit removed from the area I think she's describing, although to the extent that she described it as being on the neck and shoulder, and the jugular is on the

neck, that could be, but I'm not in love with the idea though.

Q      Let's talk about that bruise in the left temporalis muscle, the muscle that had some hemorrhaging, not bruise but I think there was some bleeding or hemorrhaging in the muscle in that area of the muscle on the left temporal area.  What could have caused that in relationship to this particular injury?

A      All these fractures.

Q      What do you mean?

A      Well, she has fractures in the base of the skull.  She has fractures involving the bone to which this muscle attaches, and that could easily cause hemorrhage into the muscle, just as it caused bleeding into the nose, and into the back of the throat.

Q      Did these fractures in the front of the skull, or in the base of the skull -- by the base of the skull you mean the fossa or the platform that the brain sits on inside the skull, is that right?

A      Yes, that's right.

Q      And that fracture, the fractures in the interior fossa, the fracture of the ethmoid bone, all of those fractures could have caused hemorrhaging or bleeding throughout that area, is that what you're saying?

A      Exactly.

Q      In addition, that bleeding going into the nose and throat, would that have caused blockage of the air passages going into her lungs?

A      It certainly could have.

Q      And as you notice in the description by the EMS technicians, they did a number -- were trying, and attempted a number of intubations, trying to establish an airway, and they talk about the fact that there's a great deal of tissue and blood in the mouth, do they not?

A      They do.

Q       In fact they talk about in one sense that there appeared to be so much in there and it was so distorted that they even thought there was a mouth wound, that she'd been shot in the mouth, initially.

A       Yes.

Q       Would that be caused by the bullet wound of the head?

A       Yes, these are secondary effects of the bullet wound.

Q       There was nothing noted about any marks on the neck that would indicate any type of strangulation was there?

A       I don't recall that there was.

Q       There was nothing noted about any fractures of the hyoid bone, or anything else in the throat area.

A       That's correct.

Q       If a great deal of force had been applied to that area, would there be other visible injuries?

A       A compressive force powerful enough to cause unconsciousness, let's say, should produce soft tissue effects like a broken hyoid bone or hemorrhage around the hyoid bone, or hemorrhage into soft tissues higher up in the neck, not around the tracheostomy.

Q       And in this particular case, the hemorrhages were in the lower part of the neck, were they not?

A       I think she said that.

(Reporter's Record, Vol. VII, pp. 205-10).

The prosecutor cross-examined Dr. Ratalac, as follows:

Q       How many gunshot wounds did you do autopsies on last week?

A       None.

Q       How many strangulations?

A     Last week?

Q     Last week.

A     None.

Q     How many this year?

A     This year, I think I've done one suicide strangulation.  I don't think I've done --

Q     That would be where you'd, I guess hang yourself?

A     Yes.

Q     Not a manual or forcible from another person.

A     Correct.

Q     Didn't do one of those last year.

A     No.

Q     And gunshot wounds this year?

A     I don't think I've done a gunshot wound this year.

Q     And when was the last gunshot wound you saw that caused petechia damage to the eyes?

A     I can't remember specifically, but I have seen it.

Q     But you don't remember when?

A     No.

Q     And I suppose you've read Dr. Parangao's testimony, you've indicated that already.

A     I have.

Q     And he says he's never seen it.  I guess you take issue with that?

A      I don't take issue with what he said or what he's seen.  All I can do is tell you what I have seen.

Q      And he is a -- I think he -- tell the ladies and gentlemen what's the difference between a forensic pathologist and a pathologist such as yourself.  Is there a difference?

A      There is a bit of a difference.  It's not perhaps as major as you might think.  Forensic pathology is kind of a niche or an adjunct to regular pathology.  They deal more with gunshot wounds, strangulations, traumatic events.  We deal more with  hospital events, which are normally naturally and part of the disease process.  It's a relative -- it's a relative thing.  It's not an absolute thing.

Q      But I mean, you testified I believe, when you first started testifying that you deal more with disease processes as opposed to bullet wounds, strangulations, hangings, physical beatings, and that sort of thing.

A      Right.

Q      And you haven't done any of those this year.  This is November, we're almost half way through November.

A      Well, you asked me why --

Q      Why not then -- oh excuse me.  I'm --

A      You have a tendency to do that, you know.  We  talked about that last time.  You asked me specifically about strangulations, I think, and gunshot wounds, not about beatings, automobile accidents or whatever else you drifted off into.  Do you want me to answer?

Q      No, I was --

A      On the same question?

Q      I was referring specifically to gunshots, because that's what we're dealing with here.

A      Right, yes.  And I said I have not done one this year.

Q     And strangulations, there appears to be some -- would you agree that there's some evidence in the autopsy report that you could relate to some sort of force or pressure to the neck area of this young lady?

A     You could.

Q     I'm talking about -- well, from what she has prepared.

A     Well, it could relate to strangulation.

Q     Your own testimony can and could relate to a lot of different variable that we just don't know about.

A     Well, this is a tough case.

Q     Right.

A     There is reasonable doubt in relation to virtually every one of these areas other than the fact that the gunshot wound killed her.

(Reporter's Record, Vol. VII, pp. 214-17).

The Fifth Circuit has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) (citing *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008)).  To prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must identify the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.* (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  The Fifth Circuit has required this showing for both lay and expert witnesses.  *See, e.g., Evans v. Cockrell*, 285 F.3d 370, 377-78 (5th Cir. 2002) (rejecting uncalled-expert-witness claim when the petitioner failed to present evidence of what a scientific expert would

have stated); *United States v. Doublin*, 54 F. App'x 410 (5th Cir. 2002).  The Fifth Circuit has subsequently clarified that the requirements of showing availability and willingness to testify "[are] not a matter of formalism." *Woodfox v. Cain,* 609 F.3d 774, 808 (5th Cir. 2010).  A petitioner must present evidence on these points as part of the burden of proving that trial counsel could have found and presented a favorable witness, including an expert witness.  *Id.*

Dorsey has not satisfied any of these requirements.  He has not named an expert who should have been called, demonstrated availability and willingness to testify, set out the content of the proposed testimony, or shown that the testimony would have been favorable to a particular defense.  Dorsey has not shown that a forensic pathologist was available to testify at trial, that he would have done so, or that he would have testified to opinions and conclusions rebutting the State's expert witness, Dr. Parangao.

Dr. Ratalac analyzed and rebutted much of the State's medical expert testimony.  Dorsey does not explain why calling a forensic pathologist would have altered the outcome at trial.  Any expert called by the defense would have had to account for the petechial hemorrhages, the strap hemorrhaging, and the bruise on the left side of Pamela Dorsey's neck.  The jury heard ample evidence that she wanted a divorce and that she was afraid Dorsey would leave the country with their son if she left the marriage.  The State's expert testified that she had an injury to the left side of her head and there was evidence of strangulation.  There is no basis to believe that additional expert testimony on the cause of the petechial hemorrhages, the strap muscle hemorrhaging, and the bruise on the left side of the neck would have changed the result at trial.

The state habeas court found:

> 33.    Based on Mr. Park's credible affidavit and the record, Dr. Ratalac was sufficiently qualified as an expert witness and was allowed to testify as such by this Court.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding. This finding is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1)  Dorsey has not produced clear and convincing evidence to rebut this finding. The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Dorsey has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

### H.    Failure to Rebut Testimony

Dorsey asserts that his trial counsel was ineffective for failing to rebut misleading prejudicial testimony that the State elicited from the defense medical expert, Dr. Ratalac. (Docket Entry No. 1, Federal Petition, p. 30). Dorsey states that the State argued that Pamela Dorsey was strangled before she was shot. The State asked Dr. Ratalac if an unconscious person can struggle when strangled. Dorsey asserts that this question by the State was meant to mislead the jury into believing that if Pamela Dorsey was unconscious while Dorsey was strangling her, there would be no marks of a struggle. The State asked this question in response to Dr. Ratalac's testimony that there were no marks on Pamela Dorsey's neck that would indicate strangulation. Dorsey asserts that the State's own medical expert testified that Pamela Dorsey was strangled before her death, even though there was no evidence she was unconscious before the shooting. Dorsey faults counsel for failing to rebut the impression the State left with its question to Dr. Ratalac.

The State presented the expert testimony of Dr. Parangao, suggesting that Pamela Dorsey was strangled before being shot. During the defense case, counsel presented the expert testimony of Dr. Ratalac. As discussed in Section V-G, counsel questioned Dr. Ratalac at length about whether petechial hemorrhages, the hemorrhaging in the strap muscle, and the bruise on the left side

of the neck were consistent with strangulation or some other cause.  Counsel questioned Dr. Ratalac

about strangulation, as follows:

> Q    Again, relating it to the facts that you know about this particular case where we have a -- implications being made that it might have been, or was there a strangulation attempt, or something of  that nature.  How does the fact that her fingernails were long and painted with red polish relate to that?
>
> A    Well, the red polish of course in [sic] inconsequential, but intact long fingernails are not the expectation in someone who had been defending themselves against strangulation.
>
> Q    Why is that?
>
> A    Because they fight.  They scratch, pull, grab,  twist, turn, kick, and although I guess you could go through all those things and maintain long fingernails, it's not that likely, in my opinion.
>
> Q    And is that why Dr. Krohn likely put it in the autopsy report?
>
> A    Well, you know, I can't enter Dr. Krohn's mind to that extent, but she does make a point of putting it in there for something, I suppose.

(Reporter's Record, Vol. VII, pp. 231-32).

On further cross-examination, the prosecutor asked the following question:

> Q    Doctor, when was the last person subject to strangulation that was unconscious -- when was the last time you saw such a person struggle?
>
> A    Well, if a person's unconscious and then subsequently strangled, they will not struggle if they're truly unconscious.
>
> Q    Thank you.

(Reporter's Record, Vol. VII, p. 233).

The state habeas court found:

>33.    Based on Mr. Park's credible affidavit and the record, Dr.
>Ratalac was sufficiently qualified as an expert witness and was
>allowed to testify as such by this Court.

*Ex parte Dorsey,* Application No. 67,702-02 at 478.

The Court of Criminal Appeals expressly based its denial of habeas relief on this finding, which is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Dorsey has not produced clear and convincing evidence to rebut this finding. Dorsey does not explain how further questioning of Dr. Ratalac would have altered the outcome at trial. The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Dorsey has not shown a basis for relief. 28 U.S.C. § 2254(d)(1).

## VI.    The Ineffective Assistance of Appellate Counsel Claim  (Ground 3)

Dorsey alleges that his appellate counsel was ineffective for failing to raise trial-court error and failing to raise ineffective assistance of trial counsel in his direct appeal.   (Docket Entry No. 1, Federal Petition, pp. 7, 8, 35, 37; Docket Entry No. 2, Petitioner's Memorandum, pp. 11, 38, 39, 42, 44).  Dorsey specifically faults his appellate counsel for failing to present two claims on direct appeal: (1) that the trial court abused its discretion by admitting the video interview of C.D., in violation of Dorsey's right to confrontation and cross-examination; and (2) trial counsel was ineffective for failing to timely object to Detective Tidwell's narration of the videotape showing C.D. with the gun, on the grounds that the statements were hearsay and violated Dorsey's right to confrontation and cross-examination.  *Id.*

A criminal defendant has a constitutional right to the effective assistance of counsel on a first appeal as of right.  U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668, 688 (1984); *Anders v. California,* 386 U.S. 738, 744 (1967).  An ineffective assistance claim is governed by the familiar standards set forth in *Strickland v.*

*Washington,* 466 U.S. at 668; *see Styron v. Johnson,* 262 F.3d 438, 450 (5th Cir. 2001) (applying the *Strickland* standard to ineffective assistance claims against appellate counsel).  In this context, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance he would have prevailed on appeal.  *Sharp v. Puckett,* 930 F.2d 450, 453 (5th Cir. 1991).  A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  *Id.* at 668, 688-89.  But counsel is not required "to raise every nonfrivolous ground that might be pressed on appeal."  *Ellis v. Lynaugh,* 873 F.2d 830, 840 (5th Cir. 1989).  Instead, counsel must raise and brief those issues believed to have the best chance of success.  *See Schaetzle v. Cockrell,* 343 F.3d 440, 445 (5th Cir. 2003); *United States v. Williamson,* 183 F.3d 458, 462-63 (5th Cir. 1999).  To prove ineffective assistance of appellate counsel, a petitioner must show that the decision not to raise an issue on appeal fell below an objective standard of reasonableness.  *United States v. Phillips,* 210 F.3d 345, 348 (5th Cir. 2000).

Dorsey contends that his appellate counsel failed to argue that the trial court abused its discretion and that counsel rendered ineffective assistance.  In Sections V and VIII, this court considered and rejected Dorsey's claims based on trial-court error and ineffective assistance of trial counsel.  Raising these claims on appeal would have been frivolous.  *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001) (finding that when each basis for the alleged errors by counsel on appeal was found to lack merit, appellate counsel's failure to pursue relief on those bases is not ineffective assistance of counsel.

The appellate court summarized Dorsey's sixteen grounds of error, as follows:

> In his first four issues, appellant contends the trial court reversibly erred in admitting evidence of the movie NEVER TALK TO STRANGERS (Columbia/Tristar 1995) because 1) it amounted

72

to a comment on the weight of the evidence, 2) it was irrelevant, 3) it was in violation of Texas Rule of Evidence 404(b), and 4) its probative value was exceeded by its prejudicial value.

. . .

Appellant's next six issues concern the admission into evidence of a video tape of his son [C.D.'s] interaction with the holstered gun used in Pamela's shooting. . . .  In issues five and six, appellant contends his federal and state due process rights were violated because the State maintained inconsistent positions between the first trial and the second trial of this case.  In his seventh, eighth, ninth, and tenth issues, appellant argues the trial court reversibly erred in denying his motion to suppress the video tape because it constituted an improper experiment, it constituted an improper interview, it constituted hearsay, and the tape was obtained in violation of a valid court order.

. . .

In his tenth issue, without citation of case authority, appellant complains that the trial court reversibly erred in denying his motion to suppress the videotape described above because it was allegedly obtained in violation of a court order.

. . .

Appellant's eleventh, twelfth and thirteenth issues are also interrelated and will be considered by us together.  The *gist* of those issues is that the trial court reversibly erred in admitting Pamela's out-of-court statements that appellant would harm or kill her and her belief that appellant would take [C.D.] away.

. . .

In his fourteenth issue, appellant argues the trial court reversibly erred in admitting evidence of extraneous acts of appellant in violation of Texas Rule of Evidence 404(b). TEX. R. EVID. 404(b). Specifically, his complaint is about testimony elicited during the cross-examination of defense witness Stacey Hert, the couple's Amway supervisor.

. . .

In his fifteenth issue, appellant argues the trial court reversibly erred in excluding the testimony of his expert witness Dr. Rex Frank, who, he says, would have testified about [C.D.'s] motor skills ability.

. . .

In his sixteenth and final issue, appellant complains of the deadly weapon finding in the trial court's judgment and asks us to reform the judgment to delete that finding.

*Dorsey v. State,* No. 09–02–023-CR, 117 S.W.3d 332, 334-43 (Tex. App. -- Beaumont [9th Dist.] 2003, pet. ref'd).

Appellate counsel's decision not to argue that the trial court abused its discretion or that trial counsel rendered ineffective assistance falls within the wide range of reasonable professional assistance.  There is no showing of a reasonable probability that, even assuming appellate counsel made unprofessional errors, the result of the proceeding would have been different but for such errors.  *Wilson v. Cockrell*, 2003 WL 21672834 *11 (5th Cir. July 17, 2003); *Duhamel v. Collins,* 955 F.2d 962, 965 (5th Cir. 1992).

The state habeas court found:

24.    The Court is familiar with Mr. Parks' reputation as a renowned criminal litigator in Texas and finds the affidavit credible.

*Ex parte Dorsey,* Application No. 67,702-02 at 477.

The state habeas court concluded:

3.    Applicant fails to prove his ineffective assistance of . . . appellate counsel by a preponderance of the evidence. *Strickland v. Washington,* 466 U.S. 668, 689 (1984); *Hernandez v. State,* 988 S.W.2d 770, 770, 772 (Tex. Crim. App. 1999).

*Ex parte Dorsey,* Application No. 67,702-02 at 479.

The state habeas court entered findings of fact refuting Dorsey's claims, and, applying the *Strickland* standard, concluded that Dorsey had received effective assistance of appellate counsel. On those findings, the Texas Court of Criminal Appeals also rejected Dorsey's ineffective assistance claims.  Absent clear and convincing evidence in rebuttal, the state court's factual determinations are presumed correct.  Applying the appropriate deference to the factual findings, the state courts'

determination of the claims was not objectively unreasonable.  *Bell v. Cone,* 535 U.S. 685, 698-99

(2002); *Haynes v. Cain,* 298 F.3d 375, 379-82 (5th Cir. 2002).  Dorsey is not entitled to habeas relief

on this claim.

## VII.    The Prosecutorial-Misconduct Claim  (Ground 4)

Dorsey alleges that the prosecutor committed misconduct by failing to maintain a consistent

position on whether the videotape of C.D. was an "experiment" or "interview."  (Docket Entry No.

1, Federal Petition, pp. 14-15; Docket Entry No. 2, Petitioner's Memorandum, pp. 108-17).  Dorsey

argues that during the first trial, the State referred to the videotape as an "experiment."  During the

suppression hearing, the State characterized the videotape as an "interview."  Detective Bonnie

Tidwell, who was in the videotape, testified that it was an interview that she conducted to gather as

much information as possible from C.D. helpful to investigate the murder of Pamela Dorsey. When

Dorsey raised hearsay objections to admissibility, the State changed its position and argued that

videotape was an experiment.  The State's last position was that the video was an "interview."

Dorsey argues that this fluctuating characterization made it impossible to defend against the

admission of the videotape.

"Prosecutorial misconduct implicates due process concerns."  *Foy v. Donnelly,* 959 F.2d

1307, 1316 (5th Cir. 1992).  A prosecutor's actions may violate due process in two ways:  "They

may abridge a specific right conferred by the Bill of Rights, or may constitute a denial of due

process generally, thus constituting a 'generic substantive due process' violation."  *Id.* (quoting

*Rogers v. Lynaugh,* 848 F.2d 606, 608 (5th Cir. 1988)).  Federal courts apply "a two-step analysis

to charges of prosecutorial misconduct."  *United States v. Duffaut,* 314 F.3d 203, 210 (5th Cir.

2002).  The courts first decide whether the prosecutor's actions were improper and, if so, they then

determine whether the actions "prejudiced the defendant's substantive rights."  *Id.*

When a petitioner asserts a generic due process violation, and it is determined that the prosecutor's actions were improper, the court asks whether the actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed.2d 431 (1974)).   In the habeas context, the appropriate standard of review for such allegations is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly* 416 U.S. at 642).   "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).   "A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Foy v. Donnelly,* 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted).

Dorsey raised this issue on appeal.   The appellate court rejected the claim, stating:

> Appellant's next six issues concern the admission into evidence of a video tape of his son [C.D.]'s interaction with the holstered gun used in Pamela's shooting.   The purpose of the tape was to determine whether [C.D.] had the physical capability of pulling the trigger of the gun.   The tape showed that [C.D.] had the physical capability of pulling the trigger of the gun when the hammer was cocked but could not do so when the gun was not cocked.   It also showed that [C.D.] could not open the holster when it was strapped shut.
>
> The issues are interrelated and we will discuss them together. In issues five and six, appellant contends his federal and state due process rights were violated because the State maintained inconsistent positions between the first trial [FN1] and the second trial of this case.   In his seventh, eighth, ninth, and tenth issues, appellant argues the trial court reversibly erred in denying his motion to suppress the video tape because it constituted an improper experiment, it constituted an improper interview, it constituted hearsay, and the tape was obtained in violation of a valid court order.

FN1. In the first trial, appellant's conviction was reversed by the Beaumont Court of Appeals. *See Dorsey v. State,* 24 S.W.3d 921, 930 (Tex. App. - Beaumont 2000, no pet.).

The tape was shot in an interview room at the sheriff's office. In the course of overruling appellant's objection to the admission of the tape, having previously viewed the tape, the trial court made findings that: 1) it was immaterial whether the taped episode was called an experiment or an interview; 2) significant factors were "the presence of the child, gun, holster, lighted room, apparently no pressure exerted one way or the other by anyone on the child;" and 3) it was not relevant whether the episode was filmed in a room that did not have a bed, whether or not there was a body there, and whether or not it looked like the room in which the decedent expired. Indeed, he opined, where the tape was shot was more conducive to a reasonable, realistic result than if it had occurred in the bedroom where the child may have had memories.

The record contains Officer Tidwell's description of the events shown on the tape. Other than the general objections to the admission of the tape we have noted, appellant initially made no objection to the narration of the events depicted. Tidwell's narrative was made as the tape was running before the jury and they could observe themselves what was taking place. Tidwell initially described the child running in front of her into the room. He picked up a couple of dolls that were in the room, looked at them briefly, threw them away, and went to the gun. It was not until that point that appellant objected to Ms. Tidwell's narrative of the events being shown on the tape. His objection was that "the tape which is in evidence speaks for itself." That objection was not timely.

The tape continued to the point where the child picked up the weapon and attempted to open the strap part on the holster. Ms. Tidwell then narrated that when the child could not open the holster because of the strap on it, "we both together got it open and he took the weapon out of the holster and began to look at it." She described the child's unsuccessful efforts to cock the double action pistol or to pull the trigger when it was uncocked.

Appellant initially argues that the State maintained inconsistent positions between the first and second trials "as to whether [C.D.]'s video tape was an *interview* or whether it was an *experiment*." He posits that the difference in the terms occurred after his initial objection. The change in terminology, he contends, was material and adversely affected his due process rights because if the

occurrence was an experiment, "it raised the legal issues regarding the legal requirements of an admissible police experiment." As best we understand, he reasons that the State's transition to the term "interview" was an attempt "to shield itself from the legal requirements of an admissible experiment" and would lessen the State's burden to establish the admissibility of the evidence.

With regard to the admissibility of experiments, appellant cites and relies upon *Marras v. State,* 741 S.W.2d 395 (Tex. Crim. App. 1987), *overruled on other grounds by Garrett v. State,* 851 S.W.2d 853 (Tex. Crim. App. 1993); *Esquivel v. State,* 595 S.W.2d 516 (Tex. Crim. App. 1980); and *Lopez v. State,* 651 S.W.2d 413 (Tex. App. - Fort Worth), *rev'd and remanded on other grounds,* 664 S.W.2d 85 (Tex. Crim. App. 1983). These cases stand for the general principle that the results of an out-of-court experiment is admissible within the discretion of the trial court if the experiment was made under conditions similar to the event to which the results of the experiment relate. *See Esquivel,* 595 S.W.2d at 529. However, that principle is qualified by the fact that an experiment not made under exactly the same conditions goes to the weight and not the admissibility of the evidence. *Id.*

In arguing that the taped events were, in effect, a recreation of the crime, appellant places considerable reliance upon the statement by the *Lopez* court that "any staged, re-enacted criminal acts or defensive issues involving human beings" are "inherently dangerous, offer little in substance and the impact of re-enactments are too highly prejudicial to insure the State or the defendant a fair trial." *Lopez,* 651 S.W.2d at 416. We find the reasoning the court employed in *Marras* helpful in considering this argument. In *Marras,* a capital murder case, the court was concerned with a videotape that showed the area through which an eyewitness walked after the witness viewed the crime. *Marras,* 741 S.W.2d at 404. The events shown on the tape were narrated by the witness as it was shown. *Id.* Marras had objected to the admission of the tape on the basis that the tape was not an accurate "duplication" and asked the appellate court to apply the reasoning of the *Lopez* court and hold the trial court erred in admitting the tape. *Id.* In considering that argument, although approving the *Lopez* explication, the *Marras* court said because the tape only showed the route taken by the witness and the accused after the crime was actually committed, it did "not depict any staged, re-enacted criminal acts" and the trial court did not abuse its discretion in admitting the tape. *Id.* Regardless of the nomenclature of the events pictured in the tape here, the reasoning employed by the *Marras* court is applicable. The events

depicted on the tape were not a re-enactment of the crime itself, the tape was taken after the crime, and the weight to be given the events depicted was a matter within the purview of the jury as fact-finder. The trial court did not abuse its discretion in admitting the tape. Appellant's fifth and sixth issues are overruled.

In his seventh, eighth, and ninth issues, appellant contends that the videotape was the result of an improper experiment or interview and thus was inadmissible as hearsay. In advancing that proposition, he initially reasons that the events shown on the tape were analogous to the child testifying and, because the child was not placed under oath, nor was there any showing that he was competent to understand the obligation that court testimony be truthful, the tape was not admissible. We agree with the State that videotape of the activities of the child is comparable to the videotapes of a driver alleged to be intoxicated. The Court of Criminal Appeals has held visual depictions of sobriety tests are not testimonial and do not violate a defendant's federal or state constitutional right against self-incrimination. *See Miffleton v. State,* 777 S.W.2d 76, 80 (Tex. Crim. App. 1989); *see also Gassaway v. State,* 957 S.W.2d 48, 50–51 (Tex. Crim. App. 1997) (recitation of the alphabet and counting backwards in sobriety tests are not testimonial in nature and thus are not within the purview of Fifth Amendment protection).

In this case, the videotape was played before the jury without sound. As we noted above, there was no attempt to recreate the actual shooting. That being so, and because the actions of the child were merely being observed, the rather strict restrictions governing the determination of the competency of child witnesses are not applicable here.

Appellant next contends that the child's activities in response to questions by Tidwell [FN2] amounted to inadmissible hearsay. He argues the fact that the child responded to Tidwell's questions by actions rather than words does not mean that [C.D.] was not communicating with Tidwell. Thus, any opinion arrived at by Tidwell as to the child's ability to pull the trigger of the gun must necessarily be based upon the child's out-of-court conduct, *i.e.,* inadmissible hearsay. To support that argument, appellant cites and relies upon *D.L.N. v. State,* 590 S.W.2d 820 (Tex. Civ. App. - Dallas 1979, no writ), a prosecution for alleged deviate sexual intercourse. However, that case is distinguishable. In *D.L.N.,* in response to questions asked by the prosecution, the father of the complainant was allowed to testify about the child's re-enactment of the acts giving rise to the prosecution. *Id.* at 822. A minister was also present at the

time and was allowed to testify about the child's actions in response to the questions.  *Id.*  It was in that context the appellate court decided the testimony was inadmissible hearsay.  *Id.*  In the instant case, none of the circumstances of appellant's version of the shooting were attempted to be re-enacted.  Rather, the child simply performed physical responses that, when viewed by the jury, were relevant and admissible to aid them in assessing the credibility of appellant's testimony.  Appellant's seventh, eighth, and ninth issues are overruled.

FN2.  The jury did not hear the audio on the videotape.

*Dorsey v. State,* No. 09–02–023-CR, 117 S.W.3d 332, 336-339 (Tex. App. -- Beaumont [9th Dist.]

2003, pet. ref'd).

The Texas Court of Criminal Appeals refused Dorsey's petition for discretionary review.

The state habeas court concluded:

> 6.    Because they were raised and rejected on direct appeal, Applicant's grounds for relief 7, 8, 9, 10, 11, 12, 15, and 16 are not cognizable on application for habeas corpus.  *Ex parte Nailor,* 149 S.W.3d 125, 131 (Tex. Crim. App. 2004).

*Ex parte Dorsey,* Application No. 67,702-02 at 479.

When a reasoned state court decision rejects a federal claim, subsequent unexplained orders upholding that judgment or rejecting the same claim are considered to rest on the same ground.  *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).  The Ninth Court of Appeals affirmed Dorsey's conviction. The Texas Court of Criminal Appeals refused Dorsey's petition for discretionary review.  Because the Court of Criminal Appeals did not issue an opinion in refusing Dorsey's petition for discretionary review, this court may "look through" the Texas Court of Criminal Appeals's unexplained refusal to the last reasoned state decision, the intermediate appellate court's decision. *Ylst v. Nunnemaker*, 111 S. Ct. at 2594.

Dorsey has failed to establish that the prosecutor's characterization of the videotape as an "interview" or an "experiment" was improper.  The government presented ample evidence at trial to support Dorsey's conviction.  The trial included multiple witnesses and several exhibits.  The State presented evidence that Pamela Dorsey was unhappy in her marriage and had asked for a divorce two days before her death.  The medical examiner concluded that evidence of petechial hemorrhaging, the strap-muscle hemorrhaging, and the bruise on the left side of the neck were consistent with strangulation; that Dorsey called his parents while speaking with the 911 operator, but he did not call Pamela Dorsey's parents; that she was wearing a bra, panties, and insulated underwear, though she did not normally sleep dressed in that fashion; that a neighbor never saw C.D. pretend to shoot a gun; and that C.D. was unable to fire the gun in double-action mode.  Any negative inference from the prosecution's characterization of the video as an "interview," as opposed to an "experiment," was *de minimis* and did not affect the ability to object to its admissibility.  The prosecutor never attempted to argue that the conditions in the room where Detective Tidwell showed C.D. the gun were the same as the crime scene.  Detective Tidwell was trying to determine if C.D. could fire the weapon and did not attempt to recreate the conditions of the master bedroom of C.D.'s home where his mother was shot.  No audio was played to the jury.  Dorsey has not shown that the prosecutorial actions so infected the trial with unfairness as to make the resulting conviction a denial of due process.  The state court's decision rejecting this claim was not contrary to clearly established federal law.  Dorsey is not entitled to habeas relief.

## VIII.   The Trial Court Error Claim  (Ground 5)

Dorsey alleges that the trial court erred by admitting the videotape of C.D. into evidence. Dorsey argues that if the videotape was considered an experiment, it failed to meet the requirements of an admissible police experiment.  It was admitted over the objection of the defense if it was an

interview.  It did not comply with any family codes.  Finally, Dorsey asserts, the video was made in violation of a court order.  (Docket Entry No. 1, Federal Petition, pp. 16-21; Docket Entry No. 2, Petitioner's Memorandum, pp. 113-27, 133-45).

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present.  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *West v. Johnson,* 92 F.3d 1385, 1404 (5th Cir. 1996).  A federal habeas court does not sit in review of a state trial court's evidentiary rulings. *Derden v. McNeel,* 978 F.2d 1453, 1458 (5th Cir. 1992).  Such rulings will mandate habeas relief only when the error is so extreme that it constitutes a denial of fundamental fairness.  *Little v. Johnson,* 162 F.3d 855, 862 (5th Cir. 1998). The erroneous admission of prejudicial evidence "does not justify habeas relief unless the evidence played a 'crucial, critical, and highly significant' role in the [verdict]."  *Jackson v. Johnson,* 194 F.3d 641, 656 (5th Cir. 1999).

Dorsey raised this issue of trial court error on direct appeal.  The state appellate court overruled the error, stating:

> In his seventh, eighth, and ninth issues, appellant contends that the videotape was the result of an improper experiment or interview and thus was inadmissible as hearsay.  In advancing that proposition, he initially reasons that the events shown on the tape were analogous to the child testifying and, because the child was not placed under oath, nor was there any showing that he was competent to understand the obligation that court testimony be truthful, the tape was not admissible.  We agree with the State that videotape of the activities of the child is comparable to the videotapes of a driver alleged to be intoxicated.  The Court of Criminal Appeals has held visual depictions of sobriety tests are not testimonial and do not violate a defendant's federal or state constitutional right against self-incrimination.  *See Miffleton v. State,* 777 S.W.2d 76, 80 (Tex. Crim. App. 1989); *see also Gassaway v. State,* 957 S.W.2d 48, 50–51 (Tex. Crim. App. 1997) (recitation of the alphabet and counting backwards in sobriety tests are not testimonial in nature and thus are not within the purview of Fifth Amendment protection).

In this case, the videotape was played before the jury without sound. As we noted above, there was no attempt to recreate the actual shooting. That being so, and because the actions of the child were merely being observed, the rather strict restrictions governing the determination of the competency of child witnesses are not applicable here.

Appellant next contends that the child's activities in response to questions by Tidwell[FN2] amounted to inadmissible hearsay. He argues the fact that the child responded to Tidwell's questions by actions rather than words does not mean that [C.D.] was not communicating with Tidwell. Thus, any opinion arrived at by Tidwell as to the child's ability to pull the trigger of the gun must necessarily be based upon the child's out-of-court conduct, *i.e.,* inadmissible hearsay. To support that argument, appellant cites and relies upon *D.L.N. v. State,* 590 S.W.2d 820 (Tex. Civ. App. - Dallas 1979, no writ), a prosecution for alleged deviate sexual intercourse. However, that case is distinguishable. In *D.L.N.,* in response to questions asked by the prosecution, the father of the complainant was allowed to testify about the child's re-enactment of the acts giving rise to the prosecution. *Id.* at 822. A minister was also present at the time and was allowed to testify about the child's actions in response to the questions. *Id.* It was in that context the appellate court decided the testimony was inadmissible hearsay. *Id.* In the instant case, none of the circumstances of appellant's version of the shooting were attempted to be re-enacted. Rather, the child simply performed physical responses that, when viewed by the jury, were relevant and admissible to aid them in assessing the credibility of appellant's testimony. Appellant's seventh, eighth, and ninth issues are overruled.

FN2. The jury did not hear the audio on the videotape.

In his tenth issue, without citation of case authority, appellant complains that the trial court reversibly erred in denying his motion to suppress the videotape described above because it was allegedly obtained in violation of a court order. The failure to cite relevant authority could result in the waiver of this issue. *See* Tex. R. App. P. 38.1(h); *Salazar v. State,* 38 S.W.3d 141, 147 (Tex. Crim. App. 2001). However, because of appellant's diligent briefing on other issues, in the interest of justice, we will consider the question presented. The record reveals that Child Protective Services took custody of [C.D.] under an emergency order on May 24, 1996. A hearing was held on the matter on the morning of May 28, 1996, the

next working day.  As a result of the hearing, custody of the child was awarded to [C.D.]'s maternal grandparents.

At the suppression hearing, James McClure, the child's maternal grandfather testified.  He averred he was present when the judge awarded custody of [C.D.] to him and his wife, although they did not pick the child up until 6:00 or 7:00 in the evening of May 28. He said that at the hearing, the District Attorney had asked them to come to his office.  When the couple arrived at the District Attorney's office, they were told that the authorities did not know exactly where [C.D.] was at the time because the person in possession of him was "shopping or something."  They were informed the authorities would let them know as soon as they contacted "her."  Evidently, that reference was to the person with whom the child had been temporarily placed.  When they were later contacted, they were told to pick the child up at the Sheriff's office.  In his testimony, McClure said that although no video taping was mentioned, he was told the Sheriff's Department wanted to see if [C.D.] could handle the gun. His response was that that would be fine, but he wanted them to do it before "I got ahold of him [the child] because I wanted to bring him back."  Although McClure did not see the tape until later, when he did so, he said he was glad it was made and had no objection to it. Appellant's tenth issue is overruled.

*Dorsey v. State,* No. 09-02-023-CR, 117 S.W.3d 332, 338-40 (Tex. App. -- Beaumont [9th Dist.]

2003, pet. ref'd).

The Texas Court of Criminal Appeals refused Dorsey's petition for discretionary review.

The state habeas court concluded:

6.     Because they were raised and rejected on direct appeal, Applicant's grounds for relief 7, 8, 9, 10, 11, 12, 15, and 16 are not cognizable on application for habeas corpus.  *Ex parte Nailor,* 149 S.W.3d 125, 131 (Tex. Crim. App. 2004).

*Ex parte Dorsey,* Application No. 67,702-02 at 479.

The Ninth Court of Appeals affirmed Dorsey's conviction and the Texas Court of Criminal

Appeals refused Dorsey's petition for discretionary review.  Because the Court of Criminal Appeals

did not issue an opinion in refusing Dorsey's petition for discretionary review, this court may "look

84

through" the Texas Court of Criminal Appeals's unexplained refusal and evaluate the appellate court's decision on the federal claim. *Ylst v. Nunnemaker*, 111 S. Ct. at 2594. The appellate court found that the videotape of C.D.'s actions was comparable to the videotape of a driver alleged to be intoxicated. The appellate court found that C.D. simply performed physical responses that, when viewed by the jury, were relevant and admissible to aid them in assessing the credibility of Dorsey's testimony. Dorsey has not shown that the trial court acted arbitrarily, unreasonably, or without reference to guiding rules or principles.

In *Pennsylvania v. Muniz,* 496 U.S. 582 (1990), the Supreme Court considered whether various incriminating utterances of a drunken-driving suspect, made while performing a series of sobriety tests, constituted testimonial responses to custodial interrogation under the Fifth Amendment. The Supreme Court stated:

> The Self–Incrimination Clause of the Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." Although the text does not delineate the ways in which a person might be made a "witness against himself," *cf. Schmerber v. California,* 384 U.S. 757, 761–762, n.6, 86 S. Ct. 1826, 1831, n.6, 16 L. Ed.2d 908 (1966), we have long held that the privilege does not protect a suspect from being compelled by the State to produce "real or physical evidence." *Id.,* at 764, 86 S. Ct., at 1832. Rather, the privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Id.,* at 761, 86 S. Ct. at 1830. "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." *Doe v. United States,* 487 U.S. 201, 210, 108 S. Ct. 2341, 2347, 101 L. Ed.2d 184 (1988).
>  . . .
>
> In the initial phase of the recorded proceedings, Officer Hosterman asked Muniz his name, address, height, weight, eye color, date of birth, current age, and the date of his sixth birthday. Both the delivery and content of Muniz's answers were incriminating. As the state court found, "Muniz's videotaped responses . . . certainly led the

finder of fact to infer that his confusion and failure to speak clearly indicated a state of drunkenness that prohibited him from safely operating his vehicle." 377 Pa. Super., at 390, 547 A.2d, at 423. The Commonwealth argues, however, that admission of Muniz's answers to these questions does not contravene Fifth Amendment principles because Muniz's statement regarding his sixth birthday was not "testimonial" and his answers to the prior questions were not elicited by custodial interrogation. We consider these arguments in turn.

We agree with the Commonwealth's contention that Muniz's answers are not rendered inadmissible by *Miranda* merely because the slurred nature of his speech was incriminating. The physical inability to articulate words in a clear manner due to "the lack of muscular coordination of his tongue and mouth," Brief for Petitioner 16, is not itself a testimonial component of Muniz's responses to Officer Hosterman's introductory questions. In *Schmerber v. California, supra,* we drew a distinction between "testimonial" and "real or physical evidence" for purposes of the privilege against self-incrimination. . . . Embracing this view of the privilege's contours, we held that "the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Ibid.* Using this "helpful framework for analysis," *ibid.,* we held that a person suspected of driving while intoxicated could be forced to provide a blood sample, because that sample was "real or physical evidence" outside the scope of the privilege and the sample was obtained in a manner by which "[p]etitioner's testimonial capacities were in no way implicated." *Id.,* at 765, 86 S. Ct., at 1832.

. . . .

Under *Schmerber* and its progeny, we agree with the Commonwealth that any slurring of speech and other evidence of lack of muscular coordination revealed by Muniz's responses to Officer Hosterman's direct questions constitute nontestimonial components of those responses. Requiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, *see Dionisio, supra,* does not, without more, compel him to provide a "testimonial" response for purposes of the privilege.

*Muniz,* 496 U.S. at 588-592.

Similarly, any evidence of lack of muscular strength or coordination revealed by C.D.'s

responses to Detective Tidwell's direct questions constitute nontestimonial components of those

responses.  The state court's decision was not contrary to clearly established federal law.  Dorsey is not entitled to habeas relief on this claim.

## IX.    The Confrontation Clause Claim  (Ground 6)

Dorsey argues that the admission of the videotape of C.D. violated the confrontation clause because it amounted to a nonverbal statement that, "I can't pull the trigger I didn't shoot mommy, daddy did."  Dorsey argues that the videotape was unreliable for the following reasons:

1)    C.D. had lost his mother in traumatic circumstances two weeks earlier.  C.D.'s actions showed that he did not want to play with the gun.  It was unlikely that C.D. was putting forth any real effort to pull the trigger of that gun during the interview, making the result unreliable and untrustworthy.

2)    None of the homicide detectives involved in making this video tried to determine if C.D.: (a) had any sleep recently; (b) if he was tired; (c) if he was sick; (d) if he was on any medications; (e) if he was injured; (f) if he knew the difference from things imaginary and real; (g) if he knew the difference between a lie and the truth; (h) if he had the capability of understanding verbal communications; (i) if he had the ability effectively to communicate; and (j) if the videotape was reliable given that the State disclaimed that the .22 gun was the weapon that killed Pamela Dorsey.  Dorsey asserts that the trial court's errors made the trial unfair.

The Supreme Court has recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examinations based on among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  The relevant inquiry is whether the jury had sufficient information to appraise the bias and motives of the witness." *United States v. Ramos*,

537 F.3d 439 (5th Cir. 2008) (quoting *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993) (internal citation omitted)). A defendant is granted substantial leeway in cross-examining a witness to discover bias. *United States v. Whitfield*, 590 F.3d 325, 363 (5th Cir. 2009) (citing *United States v. Anderson*, 933 F.2d 1261, 1276 (5th Cir. 1991)). "A state court's evidentiary ruling presents a cognizable habeas claim only if it runs afoul of a specific constitutional right or renders the trial fundamentally unfair." *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994), *cert. denied,* 513 U.S. 1163 (1995). The challenged evidence must be a crucial, critical, or highly significant factor in the context of the entire case. *Jernigan v. Collins*, 980 F.2d at 298; *Bridge v. Lynaugh,* 838 F.2d at 772; *Thomas v. Lynaugh,* 812 F.2d 225, 230 (5th Cir.), *cert. denied,* 484 U.S. 842 (1987). The test to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *See Guidroz v. Lynaugh,* 852 F.2d 832, 835 (5th Cir. 1988); *Rogers v. Lynaugh,* 848 F.2d 606, 609 (5th Cir. 1988).

A defendant has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause is triggered by the admission of out-of-court "testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In *Davis,* 547 U.S. at 822, the United States Supreme Court explained the difference between "nontestimonial" and "testimonial" statements:

> Without attempting to produce an exhaustive classification of all conceivable statements -- or even all conceivable statements in response to police interrogation -- as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made *in the course of police interrogation* under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing

emergency, and that the *primary purpose of the interrogation* is to establish or prove past events potentially relevant to later criminal prosecution (emphasis added).

The appellate court affirmed Dorsey's conviction on August 28, 2003.  The Supreme Court decided *Crawford* on March 8, 2004.  The Texas Court of Criminal Appeals refused Dorsey's out-of-time petition for discretionary review on February 6, 2008.  In *Whorton v. Bockting,* 549 U.S. 406 (2007), the Supreme Court held that *Crawford* was not retroactive on collateral review.  *Crawford* governs here because a new rule applies to cases that are still on direct review when it is announced. *Bockting,* 549 U.S. at 416-17.  The court notes, however, that the appellate court affirmed Dorsey's conviction before *Crawford* was announced.  Under either analysis, this court must determine whether the violation was harmless.[3]

Even assuming error by the trial court, a violation of the Confrontation Clause is subject to harmless error analysis.  *See Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986); *see also Arizona v. Fulminante,* 499 U.S. 279, 306-07 (1991).  On habeas review under AEDPA, the prejudice of constitutional error in a state-court criminal trial is measured by the "substantial and injurious effect" standard of *Brecht v. Abrahamson,* 507 U.S. 619 (1993).  *See, e.g., Hughes v. Quarterman,* 530 F.3d 336, 345 (5th Cir. 2008).  When a court finds itself "in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error as if it affected the verdict."  *Fry v. Pliler,* 551 U.S. 112, 127 S. Ct. 2321, 2327 n.3 (2007) (citations and quotations omitted); *see also Robertson v. Cain,* 324 F.3d 297, 305 (5th Cir. 2003) ("[T]he petitioner should prevail whenever the record is so evenly balanced that a conscientious judge is in grave doubt.").  Conversely, an error

---

[3]  Confrontation Clause violations are subject to harmless error analysis.  *See Horn v. Quarterman,* 508 F.3d 306, 322 n.24  (5th Cir. 2007) (citing *Coy v. Iowa,* 487 U.S. 1012, 1021 (1988)); *see also Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986).

is insufficient under *Brecht* when the evidence of the defendant's guilt is overwhelming.  *See, e.g., Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003).

Counsel objected to the video of C.D. on confrontation grounds in the motion to suppress. (Clerk's Record, Vol. I, p. 169).  The court held the hearing on the motion to suppress on March 8, 2001.  On March 13, 2001, the court suppressed the audio portion of the videotape of C.D. and admitted the visual portion.  In his affidavit to the state habeas court, counsel testified that the confrontation issue was raised and litigated.

Dorsey has failed to show that the trial court's admission of the videotape made his trial fundamentally unfair or that there was a reasonable probability that the verdict would have been different had the videotape not been admitted.  Any such error was harmless under *Brecht v. Abrahamson,* 507 U.S. at 623 (federal habeas relief requires a showing that a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict.").

The first *Van Arsdall* factor is the importance of the testimony in the prosecution's case.  The State presented its case-in-chief over four days, from November 6 to 9, 2001.  The State called sixteen witnesses.  (Reporter's Record, Vol. I, pp. 4-7).  The State presented its rebuttal on November 13 and 14, 2001, calling seven witnesses.  (*Id.* at 9-10).  The videotape was a very small part of the trial.

The second factor is whether the testimony was cumulative.  The videotape suggested that C.D. was incapable of firing the gun when it was not cocked.  The video showed that C.D. was not interested in the gun and that Detective Tidwell repeatedly tried to focus C.D.'s attention on the gun. This was cumulative of other evidence that C.D. had not previously played with his mother's gun. Amy Bethane testified that she and her family lived next door to the Dorseys for three years.  She

had a daughter who was close in age to C.D. and often watched the children interact. Bethane testified that she never saw C.D. pretend to point a gun at anyone.

The third issue is whether there was evidence corroborating or contradicting the testimony on material points. The State presented the testimony of David Tanner, a firearms examiner. He testified that the "trigger pull," the amount of pressure needed to fire the .22 caliber gun, was four pounds for single action and eleven pounds for double action. This evidence would corroborate the fact that C.D. lacked the strength to fire the weapon when it was not cocked.

Fourth, the record shows that counsel vigorously cross-examined the State's witnesses. Finally, there was overwhelming evidence against Dorsey. The jury heard the testimony from Pamela Dorsey's coworkers that she was unhappy in her marriage and was afraid that Dorsey would take C.D. away. She asked for a divorce on May 12, 1996, and she was shot in the back of the head two days later, on May 14, 1996. Dr. Parangao testified that the presence of a bruise on the temple suggested that she was hit by an object, and the presence of petechial hemorrhaging suggested that Pamela Dorsey had been strangled before she was shot.

Having considered the record, this court finds that allowing the videotape did not influence the jury or had only a slight effect. Dorsey has failed to raise an issue as to whether admission of the videotape had an injurious effect or influence on the jury's verdict. Dorsey's claim of trial-court error lacks merit. Given the overwhelming evidence against Dorsey, the trial court's limitation on the cross-examination of C.D. did not prejudice Dorsey. He has not met his burden of showing the state court decision to deny relief was contrary to, or involved an unreasonable application of, clearly established federal law. The record does not show that the decision was based on an unreasonable determination of the facts in light of the evidence. Dorsey is not entitled to federal habeas relief on this claim.

91

**X.      The Double Jeopardy Claim  (Ground 7)**

Dorsey contends that his conviction violates double jeopardy because the "State was barred from relitigating the same out-of-court statements found to be inadmissible in *Dorsey v. State,* 24 S.W.3d 921 (Tex. App.—Beaumont 2000)."  (Docket Entry No. 2, Petitioner's Memorandum, pp. 128-33).  During cross-examination of Sheriff Detective Franklin, counsel requested Franklin to refresh his memory from his report and tell the jury what the trigger-pull poundage was.  On redirect, the officer read into evidence the statement by Pamela Dorsey's friend stating that Pamela Dorsey believed her husband would kill her.  Dorsey states that the Ninth Court of Appeals previously determined that the friend's statements were inadmissible.  Dorsey argues that the trial court's admission of these statements violated that ruling and relitigated the matter, violating the Double Jeopardy Clause.

Double jeopardy protects against multiple prosecutions and punishments for the same offense.  *See Monge v. California,* 524 U.S. 721, 727 (1998).  It "serves three interests, protecting against:  (1) prosecution of the same offense after acquittal; (2) prosecution of the same offense after conviction; and (3) multiple punishments for the same offense."  *United States v. Berry,* 977 F.2d 915, 918 (5th Cir. 1992).  Dorsey has not shown that he was prosecuted after he was acquitted, that he was prosecuted for the same conviction, or that he has received multiple punishments for the same offense of murder.  "[T]he Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction."  *Lockhart v. Nelson,* 488 U.S. 33, 38 (1988).

The test for resolving double jeopardy challenges was set out by the Supreme Court in *Blockburger v. United States,* 284 U.S. 299 (1932).  Under *Blockburger* double jeopardy concerns

are not raised if each crime charged requires an element of proof the other crimes charged do not. *Id.* at 304.  "The *Blockburger* test has nothing to do with the evidence presented at trial.  It is concerned solely with the statutory elements of the offenses charged." *Davis v. Herring,* 800 F.2d 513, 517 (5th Cir. 1986).  The better interpretation of *Blockburger* is one that focuses "on the *elements* of the offense charged, *not* on the evidence adduced at trial." *United States v. Rodriguez,* 612 F.2d 906, 919 (5th Cir. 1980) (en banc), *aff'd,* 450 U.S. 333  (1981), *overruled on other grounds, United States v. Michelena–Orovio,* 719 F.2d 738, 757 (5th Cir. 1983) (en banc), *cert. denied,* 465 U.S. 1104 (1984).  Dorsey has failed to show a double jeopardy violation.

"[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *United States v. Brown*, 571 F.3d 492 (5th Cir. 2009) (quoting *Ashe v. Swenson,* 397 U.S. 436 (1970)).  On appeal after his first trial, Dorsey challenged the admission of hearsay statements Pamela Dorsey made to coworkers and friends.  The appellate court found:

> In point of error twelve, Dorsey contends the "trial court erred in allowing inadmissible hearsay statements of the deceased victim" into evidence.  In his brief on appeal, he characterizes the statements Pamela made to co-workers and friends as follows: "she had been seeking a divorce"; "she and appellant had not been getting along"; "appellant had been abusive towards her"; "she was afraid to divorce appellant"; "she thought appellant had followed her on some occasions"; "appellant had threatened to kill her"; "appellant had once held a knife to her throat" and; "she believed that if anything strange happened to her, like a weird car accident, it meant Dorsey had killed her."
>
> Under each of the listed categories, appellant refers us to certain pages in the record which contain specific hearsay statements objected to at trial.  Included within those references, three of which are listed above, are the following: Pamela's statement that Dorsey held her down on the bed with a knife to her throat; her statement that Dorsey held a gun to her head, up under her throat, and in her mouth; her statement that if anything ever happened to her, it meant that

Dorsey had killed her; and her statement that Dorsey followed her every day to work to make certain she was there.

The trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard on appeal. *See Coffin v. State,* 885 S.W.2d 140, 149 (Tex. Crim. App. 1994). A reviewing court should not reverse a trial judge whose ruling was within the "zone of reasonable disagreement." *Green v. State,* 934 S.W.2d 92, 101 (Tex. Crim. App. 1996) (quoting *Montgomery v. State,* 810 S.W.2d 372, 379–80, 391 (Tex. Crim. App. 1990)).

Dorsey objected to the admission of the testimony on hearsay grounds. The State claimed the evidence was admissible under TEX. R. EVID. 803(3), the "state of mind" exception to the hearsay rule, quoted below:

> (3)  Then Existing Mental, Emotional, or Physical Condition
>
> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The statements that appellant places at issue in point of error twelve contain portions that are admissible under Rule 803(3) exception and portions that are not. "Statements of intent by the declarant [Pamela Dorsey] to prove future conduct are generally admissible when the future conduct is relevant to some aspect of the case." *Wilks v. State,* 983 S.W.2d 863, 865 (Tex. App. - Corpus Christi 1998, no pet.); *see also Vann v. State,* 853 S.W.2d 243, 250 (Tex. App. - Corpus Christi 1993, pet. ref'd) (Victim's statement that he was not happy in his marriage and wanted to find a way out was admissible as a statement of his emotional state and intent to act.) Reynold's testimony that Pamela said she was thinking of leaving Dorsey and wanted the name of a divorce attorney is admissible under Rule 803(3), since it shows her future intent to leave Dorsey. Likewise, the hearsay testimony describing Pamela's fear of Dorsey is admissible under Rule 803(3) to show her emotional state or "mental feeling" at the time she made the statement. *Id.*

We reach a different conclusion, however, regarding the testimony recounting Pamela's statement that if anything strange

94

happened to her, like a car crash, it meant that Dorsey had killed her. Because the out-of-court statement represents a belief held by Pamela, we conclude it does not fall under the exception in Rule 803(3).  *See Vann,* 853 S.W.2d at 250 (Deceased's statement that he "wouldn't be surprised if Cherie was waiting for me at home with a gun and shot me" was not admissible under Rule 803(3), because it went beyond his state of mind and entered the realm of his belief.); *see also Barnum v. State,* 7 S.W.3d 782 (Tex. App. - Amarillo 1999, no pet. h.) (Deceased's statement that she believed her husband might be planning to murder her for life insurance proceeds was a statement of belief and not admissible under Rule 803(3)).

Likewise, inadmissible are Pamela's out-of-court statements that Dorsey had once held her down on the bed with a knife to her throat, that he held a gun to her head and throat and had put a gun into her mouth, and that he followed her every day to work to make certain she was there.  Such statements are not reflective of her state of mind or a belief, but simply recount her memory of events.  *See Navarro v. State,* 863 S.W.2d 191 (Tex. App.-Austin 1993), *pet. ref'd,* 891 S.W.2d 648 (Tex. Crim. App. 1994). (Deceased's statements to her mother that appellant put a gun to her head and threatened to kill her are statements of memory to prove the fact remembered and not admissible under Rule 803(3)); *Buhl v. State,* 960 S.W.2d 927, 932 (Tex. App.-Waco 1998, pet. ref'd) (Trial court was correct in excluding testimony by a witness, that defendant had said he was afraid of victim because victim pulled guns on him, since relevance of victim's out-of-court statement hinged on truthfulness of his assertion that victim had, in fact, pulled guns on him.).

The statements herein were not reflective of Pamela's state of mind but instead were her memories of specific events.  They were not admissible under Rule 803(3).  Quoting Justice Cardozo, the Court of Appeals pointed out in *Gibbs v. State,* 819 S.W.2d 821, 837 (Tex. Crim. App. 1991), *cert. denied,* 502 U.S. 1107, 112 S. Ct. 1205, 117 L. Ed.2d 444 (1992) that if the distinction between state of mind and a statement of "memory or belief to prove the fact remembered or believed" is ignored, "there would be an end, or nearly that, to the rule against hearsay."

The State refers us to our holding in *Williams v. State,* 798 S.W.2d 368 (Tex. App.-Beaumont 1990, no pet.).  There, this Court found a witness's testimony regarding the victim's out-of-court statements to be admissible under the state of mind exception to the hearsay rule.  We find the *Williams* case distinguishable from the instant case.  In *Williams,* the victim testified as the State's last

95

witness.  Prior to her testimony, the State called as a witness the deputy who had been dispatched to the hospital to speak with the victim shortly after she reported the sexual assault to the authorities. The deputy testified that during the interview at the hospital the victim was crying, shaking, and scared, and she kept telling the deputy that he (the defendant) was going to kill her.  The deputy further indicated the victim was very disturbed.  We characterized the officer's testimony as a description of the victim's emotional state and found it admissible under Rule 803(3).

In the instant case, the testimony of the three witnesses regarding the statements mentioned above does not reflect a description of Pamela's emotional state.  Instead, the statements are simply a description of three specific incidents – Dorsey's holding Pamela down on the bed with a knife to her throat, his holding a gun to her head, throat, and mouth, and his following her to work every day – and, in the other instance, a specific belief – that if she died in some unusual way, Dorsey would have been the one who killed her.

It is true that evidence from other witnesses indicating domestic violence in the Dorsey home came in otherwise.  It is also well established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence.  *See Anderson v. State,* 717 S.W.2d 622, 628 (Tex. Crim. App. 1986); *Couchman v. State,* 3 S.W.3d 155, 160–61 (Tex. App.-Fort Worth 1999, pet. ref'd).  However, that evidence is not the same or even substantially similar to this evidence. The holding of a knife to Pamela's throat and a gun to her head, mouth, and throat is of a different character altogether.  We, therefore, conclude the trial court abused its discretion in admitting the hearsay testimony, because the statements do not fall within the exception to Rule 803(3), and the same or similar evidence did not come in otherwise.  As a result, the trial court's decision to admit the evidence was not within the zone of reasonable disagreement.  We must, therefore, determine whether, under TEX. R. APP. 44.2(b), the error is harmful . . . .

We have grave doubts about the effect of the erroneously admitted evidence and find its admission had a substantial and injurious effect on the verdict.  Point of error twelve is sustained, and the case is remanded to the trial court for a new trial.  We need not address the remaining points of error, because sustaining any one of them would not afford any greater relief.

We reverse the judgment and remand the case for a new trial.

*Dorsey v. State,* 24 S.W.3d 921, 927-930 (Tex. App. -- Beaumont [9th Dist.] 2000, no pet.).

The appellate court found Reynold's testimony that Pamela Dorsey said she was thinking of leaving and wanted the name of a divorce attorney admissible under Rule 803(3) because it showed her future intent to leave Dorsey.  The appellate court further found that the hearsay testimony describing Pamela Dorsey's fear of her husband was admissible under Rule 803(3) to show her emotional state or "mental feeling" at the time she made the statement.  During Dorsey's third trial, the jury heard these hearsay statements, but the prosecutor did not present the hearsay statements found to be inadmissible by the Ninth Court of Appeals.  There was no presentation of evidence that collateral estoppel would bar.

The state habeas court concluded:

> 5.    The trial court's evidentiary ruling on whether the victim's hearsay statement was admissible does not give rise to a collateral estoppel claim.

Ex parte Dorsey, Application No. 67,702-02 at 479 (citation omitted).  Dorsey is not entitled to habeas relief on this claim.

## XI.    Request for Evidentiary Hearing

Dorsey requests an evidentiary hearing in this case. Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
>
> (A)  the claim relies on --
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and

97

>(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.*

The decision whether to conduct an evidentiary hearing is in this court's discretion. *See Williams v. Taylor,* 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus" proceedings); *Conner v. Quarterman,* 477 F.3d 287, 293 (5th Cir. 2007) (citing *Roberts v. Dretke,* 381 F.3d 491, 497 (5th Cir. 2004) (citation omitted)); *McDonald v. Johnson,* 139 F.3d 1056, 1060 (5th Cir. 1998). If there is a factual dispute that, if resolved in the petitioner's favor, would entitle him to relief, and the State has not afforded the petitioner a full and fair hearing, an evidentiary hearing should be held. *Clark v. Johnson,* 202 F.3d 760, 766 (5th Cir. 2000); *Perillo v. Johnson,* 79 F.3d 441, 444 (5th Cir. 1996). This court has been able to resolve all issues raised in this case based on the pleadings and state-court records. As discussed, the facts and claims Dorsey seeks to develop lack merit. Dorsey has failed to provide a factual basis for granting an evidentiary hearing. An evidentiary hearing is not required because there are no relevant factual disputes that would require development to assess the claims. *Robinson v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999).

Dorsey's request for an evidentiary hearing, (Docket Entry No. 2, p. 3), is denied.

## XII.   Conclusion

The respondent's motion for summary judgment, (Docket Entry No. 17), is granted. Dorsey's petition for a writ of habeas corpus is denied. Dorsey's motion for extension of time to respond to the motion for summary judgment, (Docket Entry No. 19), is granted *nunc pro tunc.* Dorsey's motion to delete claims #1 (No Evidence), #31 (Ineffective Assistance of Counsel in

failing to object to hearsay statement on the ground of collateral estoppel) and #32 (Ineffective Assistance of Counsel in failing to object on the grounds of law of the case, (Docket Entry No. 20), is granted.  Dorsey's motion to supplement the record, (Docket Entry No. 24), is denied.  This case is dismissed.  Any remaining pending motions are denied as moot.

Under AEDPA, Dorsey must obtain a certificate of appealability before appealing the denial of his habeas petition.  28 U.S.C. § 2253(c)(2).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'"  *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)).  A certificate of appealability will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," a certificate of appealability should issue only when the prisoner shows both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Jimenez v. Quarterman*, — U.S. —, 129 S. Ct. 681, 684 n.3 (2009) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001).

A district court may deny a certificate of appealability on its own without requiring further briefing or argument.  *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  This court

determines that Dorsey has not made a substantial showing of the denial of a constitutional right and that jurists of reason would not find the procedural rulings debatable.  A certificate of appealability will not issue.

SIGNED on September 7, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge